UNITED STATES of America,
Plaintiff–Appellee,

v.

James Larry JOHNSON, Defendant–
Appellant.

No. 96–4313.

United States Court of Appeals,
Fourth Circuit.

Argued April 11, 1997.

Decided May 22, 1997.

**ARGUED:** Eric A. Bach, Charlotte, NC, for Appellant. David Culver Keesler, Assistant United States Attorney, Charlotte, NC, for Appellee. **ON BRIEF:** Mark T. Calloway, United States Attorney, Charlotte, NC, for Appellee.

Before MURNAGHAN, Circuit Judge, and BUTZNER and PHILLIPS, Senior Circuit Judges.

Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Senior Judge BUTZNER and Senior Judge PHILLIPS joined.

## OPINION

MURNAGHAN, Circuit Judge:

In the instant case, James Larry Johnson, challenges his conviction in the district court. On appeal, Johnson asserts that the district court erred in denying his motion to suppress the evidence found in his automobile and the

in-court identification of Johnson by his codefendant Bobby Lee Campbell. Johnson also assigns error to the district court's failure to allow his counsel to withdraw, the district court's admission of his Georgia prison identification card, and the district court's designation of Johnson as a career offender pursuant to U.S.S.G. § 4B1.1.

## I.

## FACTS AND PROCEDURAL HISTORY

On January 15, 1995, Johnson and his codefendant, Bobby Lee Campbell, met at a hotel in Charlotte, North Carolina to discuss robbing a bank. On January 17, 1995, at about 10:35 a.m., Johnson and Campbell entered the Centura Bank in Charlotte, North Carolina. Once inside, Johnson pointed his gun at bank employees, and Campbell, carrying a canvas bag, jumped over the teller counter.

Charlotte–Mecklenburg Police Officer Joey Hovis, who was working as an off-duty security officer at the bank, drew his weapon, pointed it at Johnson, and told Johnson to drop his gun. Hovis also commanded Campbell to get on the floor and to drop his weapon. While continuing to point his gun at Officer Hovis, Johnson slowly backed out of the bank and fled the scene. Campbell remained in the bank's lobby, and Officer Hovis placed him under arrest. After his arrest, Campbell provided the police with a detailed statement about the robbery, and testified at Johnson's trial.

### A. *Automobile Search*

On the evening of January 20, 1995, Deputy Ronald Poole of the Cabarrus County Sheriff's Department received a radio call concerning a suspicious black male possibly with a gun at the local Food Lion grocery store. Soon thereafter, Deputy Poole arrived at the Food Lion store, where he observed persons pointing toward the corner of the building. Deputy John Wilson and Deputy Paul Harris, who were eating at a deli, also received the radio call, and proceeded to the Food Lion. As Wilson and Harris arrived they observed a vehicle pull around the corner of the building and proceed to the back of the shopping center.

Thereafter, Wilson and Harris activated their blue lights and followed the vehicle. Deputy Poole pulled his vehicle behind Wilson and Harris' car. Because the car did not stop immediately, Deputy Wilson employed the loudspeaker to order the car to stop. Johnson exited his vehicle. Deputy Poole ran a license check and determined that Johnson's license had been revoked in both Georgia and North Carolina. Deputies Wilson and Harris conducted a patdown of Johnson, but no weapon or contraband was found. The deputies then asked Johnson if they could search his car. He consented.

Deputy Wilson began the search of the passenger compartment of Johnson's car. Sometime during the search, Johnson stated "wait a minute", and the deputies stopped their search. During the search, Deputy Poole informed Deputies Wilson and Harris about Johnson's revoked license, and Johnson was placed under arrest. Instead of taking Johnson's car to the impound lot, the car was pulled around to the front of the shopping center and locked. After Johnson was removed from the scene, Deputy Wilson again searched Johnson's car and found a loaded handgun under the seat. Based upon Deputy Wilson's discovery, Deputy Poole also charged Johnson with carrying a concealed weapon.

### B. *Identification*

On January 23, 1995, six days after the bank robbery, Johnson's co-defendant, Campbell appeared in federal court. FBI Special Agent Mark Rozzi was also present. On behalf of Campbell, his attorney Douglas Hill, informed Agent Rozzi that his client was willing to assist the government in its investigation. Agent Rozzi then presented Campbell with a single photograph of Johnson, and Campbell identified Johnson as the man who had robbed the bank with him. On the back of the photograph, Campbell wrote "[t]his is the guy that robbed the Centura Bank at 2600 [Sharon] Road West with me, Bobby Lee Campbell."

Prior to Campbell's identification of Johnson in court, Agent Rozzi met with Campbell

after his arrest on the day of the robbery. During that time, Agent Rozzi requested that Campbell describe the person who robbed the bank with him. Campbell stated that he only knew the person as Rico, and that Rico was approximately 32 years old, six feet two inches tall, that he had a box haircut, weighed approximately 225 pounds, was dark complected and had a gold front tooth.

## C. *Withdrawal of Counsel*

On June 6, 1995, Johnson mailed a letter to the clerk of the district court requesting a new attorney because he did not feel his present attorney, Eric Bach, was adequately preparing his case. For some unknown reason, the clerk's office never forwarded the letter to the district judge assigned to the case, the Assistant United States Attorney (AUSA) or Mr. Bach.

On July 18, 1995, Johnson asked Mr. Bach to withdraw, and on the next day, Mr. Bach filed a motion to withdraw. On July 20, 1996, the district court held a hearing on Bach's motion. After hearing from all sides, the district court determined the Johnson had not been prejudiced by any of his attorney's actions, and declined to grant Mr. Bach's motion to withdraw. The district court, however, noted that he would revisit the issue if the case was not reached because of unseen delay.

## D. *Evidence Offered at Trial*

At trial, having pled to bank robbery charges, Campbell testified against Johnson. Campbell explained that he knew Johnson as Rico, and he spent time with Johnson at the Villager Lodge in Charlotte, North Carolina, and on Craighead Avenue. During his testimony, Campbell testified that as the two were planning the robbery, Johnson stated that he "had done some time in Georgia." After Campbell's statement, the district judge gave a limiting instruction that the testimony concerning Johnson's incarceration in Georgia was being admitted for the purposes of identification only. Campbell was also asked to identify the person that robbed

the bank with him, and over the objection of defense counsel, Campbell identified Johnson.

The government also called Special FBI Agent Richard Womble who testified that he and other law enforcement officers arrested Johnson on bank robbery charges at the Continental Inn in Charlotte. The agents searched Johnson's hotel room and his vehicle. During the search, the agents recovered a Georgia prison identification card bearing the name James Johnson. Over defense counsel's objection, the district court admitted the identification card. Again, the district court gave a limiting instruction concerning the limited admissibility of the evidence. The handgun recovered from Johnson's car by Deputy Wilson was also admitted.

## E. *Sentencing*

Following Johnson's conviction, the probation officer prepared a Presentence Report (PSR). Based upon Johnson's prior convictions in North Carolina state court for felony breaking and entering, assault on a female, and assault by pointing a gun,[1] the PSR recommended that Johnson be sentenced as a career offender under U.S.S.G. § 4B1.1. Johnson objected to the use of the assault on a female conviction charge.

In 1994, North Carolina reduced the statutory maximum for assault on a female from two years to 120–150 days. Johnson contended that the conviction could not be used for the career offender calculation because the crime was no longer a felony. The probation office recommended no changes. The district court accepted the PSR recommendations, and sentenced Johnson as a career offender.

On February 15, 1995, a federal grand jury indictment had charged Johnson and Campbell, with conspiracy to commit bank robbery under 18 U.S.C. § 371 (Count One); bank robbery under 18 U.S.C. § 2113(a) (Count Two); use and carrying a firearm during a crime of violence under 18 U.S.C. § 924

---

1. After the probation office determined that a white male had been convicted of this charge, the conviction was removed from Johnson's PSR.

(Count Three); armed bank robbery under 18 U.S.C. § 2113(d) (Count Four); and possession of a firearm by a convicted felon under 18 U.S.C. § 922(g) (Count Five).

Johnson filed motions to suppress the gun recovered from his automobile and Campbell's identification of him. The magistrate judge recommended both motions be denied, and the district court acting on that recommendation denied the motions.

On July 24, 1995, Johnson's case proceeded to trial.[2] The jury returned guilty verdicts on Counts, One, Two, Three, and Four. On April 1, 1996, the district court sentenced Johnson to 322 months of imprisonment, to be followed by five years of supervised release. Johnson filed his notice of appeal on April 9, 1996.

## II.

### DISCUSSION

Johnson raises five challenges on appeal: (1) the gun recovered from his automobile should have been suppressed; (2) Campbell's in-court identification should have been suppressed; (3) the district court erred in denying Johnson's counsel's motion to withdraw; (4) the district court erred in admitting into evidence Johnson's Georgia prison identification card; and (5) the district court improperly sentenced Johnson as a career offender. We address each issue *in seriatim*.

### A. *Suppression of Gun Found in Johnson's Car*

In reviewing a denial of a suppression motion, the court reviews the district court's factual findings for clear error and the district court's legal conclusions *de novo*. *Unit-*

*ed States v. McKinnon,* 92 F.3d 244, 246 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 784, 136 L.Ed.2d 726 (1997). The critical issue in the instant case is whether the Deputies' warrantless searches of Johnson's car fall within one of the recognized exceptions. The exceptions for a warrantless search are: (1) search based upon probable cause; (2) search made incident to arrest; and (3) an inventory search. Of course, a defendant can also consent to the search.

In the instant case, the Deputies conducted two searches, and the legality of both searches, especially the second one, forms the basis for Johnson's challenge. The first search occurred after the Deputies stopped Johnson's vehicle. After patting Johnson down and finding no contraband or weapons, the officers asked Johnson if they could search his car. Johnson said yes. During the course of the Deputies' search, however, Johnson stated "wait a minute." The officers then ceased searching the vehicle. After Johnson was removed from the scene, the Deputies moved Johnson's car to the front of the shopping center. A second search of the car was done, and at that time the gun was found under the passenger seat.

On appeal, Johnson argues that the second search of his vehicle can not be justified under any of the recognized exceptions to warrantless searches.[3] Moreover, Johnson contends that he revoked his consent when he stated "wait a minute", and as such, the second search can not be justified as consensual. The Government contends that the second search can be justified as search incident to arrest, and a lawful consent search.[4] The district court, based upon the magistrate judge's recommendation, agreed that the first search was valid as a search

---

**2.** Prior to trial, the Government moved to dismiss count five of the indictment.

**3.** Presumptively, Johnson challenges the first search based on the legality of the stop. Johnson does not dispute that he consented to the first search, nor that no contraband was recovered as a result of the first search. We conclude the stop was legal. The officers testified that after receiving a radio call about a suspicious Black man at a Food Lion, they responded to the scene where persons standing outside the Food Lion were pointing to the back of the building where Johnson was turning his car. In addition, the back of

the shopping center is not a public area. Based on the above, the officers had a reasonable and articulable suspicion. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). Moreover, Johnson does not dispute that he validly consented to the first search. In any event, no contraband was located during the first search.

**4.** The Government does not argue that the second search falls within the probable cause or inventory search exceptions.

incident to arrest, and the second search was valid as consensual search.[5]

With respect to the search incident to arrest for the second search, the Government relies upon *United States v. Han,* 74 F.3d 537 (4th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1890, 135 L.Ed.2d 184 (1996). In *Han,* the court identified the critical issue as whether a search is incident to arrest when a delay exists between the arrest and the search after elimination of safety concerns.[6] *Id.* at 542. In *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Supreme Court held that a delay before the search does not render the search invalid. The Court stated:

> [O]nce the defendant is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed....

*Id.* at 807, 94 S.Ct. at 1239.

In *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), however, the Supreme Court appeared to change course.[7] Chief Justice Burger, writing for the majority, stated that:

> Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*Id.* at 15, 97 S.Ct. at 2485.[8]

Reconciling the above cases, the *Han* court stated that *Belton* stands for the proposition that justification for a search incident to arrest continues even after the likelihood of danger or destruction of evidence has subsided, but that *Chadwick* "indicates that the justification does not continue indefinitely." *Han,* 74 F.3d at 543. Hence, the determinative issue, the *Han* court opined is "whether the time and distance between elimination of the danger and performance of the search is unreasonable." *Id.*

The court noted that the bag was in the immediate control of the defendant at the beginning of the encounter; the delay lasted just a few minutes; and the search occurred at the scene of the arrest; and the delay was objectively reasonable. *Id.* Hence, the court held that:

> [W]e hold that when a container is within the immediate control of the defendant at the beginning of an encounter with law enforcement officers; and when the officers search the container at the scene of the arrest; the Fourth Amendment does not prohibit a reasonable delay, such as the one in this case, between the elimination of danger and the search.

*Id.*

■ Applying *Han* to the facts at hand, no doubt exists that the car was within Johnson's immediate control at the beginning of his encounter with the officers; the search was conducted at the scene of the arrest, after the officers moved the car to the front of the shopping center mall into a better lighted area; and the delay between the elimination of the danger—Johnson—and the search was not unreasonable. Although not entirely clear how much time elapsed between Johnson's arrest and the second

---

5. The magistrate also concluded that the second search was valid as a search incident to arrest.

6. In *Han,* the defendant argued that the district court improperly admitted evidence discovered in a warrantless search of a bag that was in his possession when he was arrested. The defendant argued that the search could not be justified as a search incident to arrest because at the time of the search, the bag was out of the defendant's control and the officers' safety concerns already had been alleviated. *Id.* at 541–42.

7. In *Chadwick,* the officers did not conduct a search of a locked footlocker in the open trunk of the defendant's car, until a hour and a half after the initial encounter with the defendant.

8. Four years later, however, in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Court confirmed that *Chadwick*'s import was not as broad as it appeared, when the Court upheld the actions of a police officer who removed the defendants from the car and separated the defendants from one another, before he searched the car. *Belton,* 453 U.S. at 456, 101 S.Ct. at 2862.

search, the record appears to indicate that as Deputy Poole was driving Johnson to the police station, Poole received a call from the other Deputies informing him of their discovery of the handgun. Upon receipt of that information, Deputy Poole, as the arresting officer, returned to the scene of the arrest to recover the handgun. Thus, the second search is justified as a search incident to arrest. Accordingly, the district court's denial of Johnson's motion to suppress is affirmed.[9]

### B. *In–Court Identification*

■ Here, Johnson argues that Campbell's in-court identification of him should have been suppressed because the initial photographic identification of Johnson by Campbell was unduly suggestive and not sufficiently reliable. Johnson bears the burden of proof on a challenge of the admissibility of identification testimony. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court stated that an eyewitness identification at trial following a pretrial identification by photograph should only be suppressed when the photographic identification procedure is so impermissibly suggestive as to give rise to the very substantial likelihood of misidentification. *Id.* at 384, 88 S.Ct. at 971; *see also Harker v. Maryland,* 800 F.2d 437, 443 (4th Cir.1986) (evidence of eyewitness identification should only be excluded from the jury's consideration if the evidence is "manifestly suspect.").

■ In determining whether identification testimony is admissible, a two-step analysis is required. First, the court examines whether the initial identification was impermissibly suggestive. *See United States v. Wilkerson,* 84 F.3d 692, 695 (4th Cir.1996) (citing *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). Second, even if the procedure was suggestive, the in-

court identification is valid provided the identification is reliable. *See Wilkerson,* 84 F.3d at 695 (citing *Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253.) In *Holdren v. Legursky,* 16 F.3d 57 (4th Cir.), *cert. denied,* 513 U.S. 831, 115 S.Ct. 106, 130 L.Ed.2d 53 (1994), the court emphasized that even if the identification procedure was unduly suggestive, the court should test the reliability based upon the totality of the circumstances. *Id.* at 61.

■ Factors used in assessing reliability include: (1) witness' opportunity to view the perpetrator at the time of the crime; (2) the witness' degree of attention at the time of offense; (3) the accuracy of witness' prior description of the perpetrator; (4) the witness' level of certainty when identifying the defendant as the perpetrator at the time of the confrontation; and (5) the length of time between the crime and the confrontation. *Wilkerson,* 84 F.3d at 695 (citing *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)).

The gravamen of Johnson's argument is that Campbell was shown a single photograph, while under arrest and in custody for charges that exposed him to up to twenty-five years in prison. Moreover, Johnson argues that Campbell was only shown the photograph briefly. Furthermore, Johnson argues that given the coercive environment in which Campbell viewed the photograph[10] and his potential bias given that he was Johnson's co-defendant, the in-court identification should have been suppressed.

The Supreme Court has consistently questioned the use of a single photograph for pretrial identification, and has encouraged the use of a reasonable photographic display. *See Brathwaite,* 432 U.S. at 117, 97 S.Ct. at 2254 (suggested use of display of reasonable number of persons would have been better than single photograph, but found identification reliable); *Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 970–71, 19 L.Ed.2d 1247 (1968) (same). Other circuit

---

**9.** Although the district court concluded the second search could be justified on consent grounds, we are not bound by the district court's basis for its ruling, and may rule on any basis supported by the record. *See Jackson v. Kimel,* 992 F.2d 1318, 1322 (4th Cir.1993) (citing *Service & Training, Inc. v. Data Gen. Corp.,* 963 F.2d 680, 685 & n. 10 (4th Cir.1992)).

**10.** Campbell viewed the photograph in a federal courtroom in the presence of federal prosecutors and other law enforcement personnel.

courts of appeal have held that the display of a single photograph is unduly suggestive, but have nonetheless held that under the second part of the identification test, the totality of the circumstances, the identification was sufficiently reliable to preclude the substantial likelihood of misidentification. *United States v. Washington,* 12 F.3d 1128, 1134 (D.C.Cir.), *cert. denied,* 513 U.S. 828, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994); *United States v. Sanchez,* 988 F.2d 1384, 1389–91 (5th Cir.), *cert. denied,* 510 U.S. 878, 114 S.Ct. 217, 126 L.Ed.2d 173 (1993); *Ruff v. Wyrick,* 709 F.2d 1219, 1220 (8th Cir.1983).[11]

■ Based on the reasoning and rationale of the above cases, we conclude that the single photograph display was unduly suggestive. Unlike the circumstances in *Brathwaite,*[12] here, Campbell was shown a single photograph, in a federal courtroom surrounded by law enforcement personnel, Campbell was Johnson's co-defendant and facing substantial time. Under these circumstances, we may assume that the showing of a single photograph would be unduly suggestive. We now turn to the reliability prong of the test.

■ Application of the reliability factors clearly demonstrates that Campbell's in-court identification was sufficiently reliable. First, as Johnson's co-conspirator during the bank robbery Campbell had more than an adequate opportunity to observe Johnson; second, it goes without saying that Campbell paid close attention to his coconspirator as they attempted to rob the bank; third, Campbell provided a description of his co-conspirator on the day of his arrest which largely matched Johnson's description; fourth, Agent Rozzi testified that Campbell expressed no hesitation at the initial identification of Johnson from the single photograph; and fifth, Campbell identified Johnson from the photograph just six days after the attempted bank robbery.

Thus, under the totality of the circumstances, Campbell's in-court identification was sufficiently reliable despite the unduly suggestiveness of the single photograph display. Hence, the district court's denial of Johnson's motion to suppress Campbell's in-court identification is affirmed.

### C. Motion to Withdraw

■ Johnson also claims that the district court erred in denying his counsel's, Eric Bach's, motion to withdraw. The court reviews the district court's denial of the motion to withdraw for abuse of discretion. *United States v. Mullen,* 32 F.3d 891, 895 (4th Cir. 1994).

In *Mullen,* the Fourth Circuit concluded that the district court abused its discretion in denying counsel's motion to withdraw. In so holding, the court outlined three factors to be used in determining whether the district court abused its discretion: "(1) timeliness of the motion; (2) adequacy of the court's inquiry; and (3) whether the attorney/client conflict was so great that it resulted in a total lack of communication preventing an adequate defense." *Mullen,* 32 F.3d at 895 (citing *United States v. Gallop,* 838 F.2d 105, 108 (4th Cir.), *cert. denied,* 487 U.S. 1211, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988)).

Johnson urges that application of the *Gallop/Mullen* factors demonstrate the district court abused its discretion in not granting Mr. Bach's motion. Turning to the first factor, the *Mullen* court stated that "[i]n considering timeliness when a defendant requests substitution of counsel, the court is entitled to take into account the . . . public interest in proceeding on schedule." *Mullen,* 32 F.3d at 895 (citing *United States v. West,* 877 F.2d 281, 286 (4th Cir.), *cert. denied,* 493 U.S. 869, 110 S.Ct. 195, 107 L.Ed.2d 149 (1989)).

In reversing the district court in *Mullen,* the court noted that the motion to withdraw

---

**11.** The Government relies upon *Sanders v. Wyrick,* 640 F.2d 186 (8th Cir.1981), which held that a single photograph was "somewhat suggestive" but not unduly suggestive. Although *Sanders* has not been overruled, in light of the Eighth Circuit's decision in *Ruff,* the holding of that case is questionable.

**12.** Although a single photograph was displayed, the person who identified the defendant was under little pressure to acquiesce because the photograph was left in an office, which the identifier looked at two days later, under no coercive pressure. *See Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2254.

was filed 33 days before trial, and thus, was unlike those cases where the motion is filed shortly before or during trial. *See, e.g., United States v. Hillsberg,* 812 F.2d 328 (7th Cir.) (defendant moved for a substitution at beginning of trial), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). Here, Mr. Bach filed his motion on July 19, 1995, and the court heard argument on the motion the next day. Four days after the hearing, the case proceeded to trial. In denying Mr. Bach's motion, the district court stated that the motion was filed on the "eve of trial." In fact, the district court repeated the phrase twice indicating his concern that given the untimeliness of the motion, the motion should be denied.

Somewhat of a thorny issue, however, is the fact that Johnson first raised the issue of Mr. Bach's withdrawal in a *pro se* motion, filed in June, over a month and a half before trial. For some inexplicable reason, the motion was never forwarded to the district judge, the AUSA, or Mr. Bach. In *Mullen,* the court recognized that the timeliness of defendant's motion should not be prejudiced by actions for which the defendant did not engage. In *Mullen,* the defendant's hearing on his attorney's motion to withdraw was delayed due to the failure on the part of the AUSA to file a response to the motion. Hence, given the district court clerk's office failure to forward Johnson's motion, which undoubtedly would have been timely, the timeliness factor should favor Johnson.[13]

As for the adequacy of the district court's inquiry, the second factor, the *Mullen* court stated that "[a]n inquiry into the reasons for defendant's dissatisfaction with his or her lawyer is necessary for the trial court to determine whether good cause for substitution of counsel exists." *Mullen,* 32 F.3d at 896 (citing *United States v. Welty,* 674 F.2d 185, 188 (3d Cir.1982)).

In the instant case, the district court first questioned Mr. Bach as to his reasons for wanting to withdraw, and then heard Johnson's reasons for wanting Mr. Bach to withdraw, and finally, heard from the AUSA prosecuting the case. Johnson essentially complained that Mr. Bach had not filed pretrial motions to suppress certain evidence and had failed to interview various witnesses given to him by Johnson, or to explore Johnson's alibis. Mr. Bach expressed his "main problem [he had] is that [Johnson] hasn't wanted to discuss at all with me possible defense evidence. . . ."

At the hearing, and the record supports, the AUSA informed the court that Mr. Bach had filed two suppression motions and had visited the U.S. Attorney's Office on three occasions to review evidence and the case file. The AUSA also added that he believed that Mr. Bach up to that point had done an "enthusiastic job." The district court then found that Mr. Bach was acting on behalf of Johnson stating that "I just don't believe that you have stated an appropriately sufficiently strong reason to replace your attorney."

The third factor requires the court to examine the extent of the breakdown in communication between Johnson and Mr. Bach. Mr. Bach clearly expressed that Johnson would not discuss major parts of the case with him and perhaps, the two were experiencing a communication problem. Johnson responded that he did not have a communication problem but that "[i]t's just the seriousness of this case and that Mr. Bach and I have seemed to always be in contempt with one another since he was first assigned to my case."

The record in the present case does not offer evidence to the degree of the total lack of communication presented in *Mullen,* wherein the defendant and her attorney did not speak for over one month. A total lack of communication is not required. Rather an examination of whether the extent of the breakdown prevents the ability to conduct an adequate defense is the necessary inquiry.

▬ From the transcript of the motion hearing, it appears that the district court did not identify any substantial complaints or conflicts that would prevent Mr. Bach from presenting an adequate defense. In fact, Johnson told the court that he did not have a communication problem with Mr. Bach, but

---

**13.** The government recognizing this states that the "timeliness of the motion does appear to mitigate [for] defendant to some degree." Appellee's Brief, at 21.

apparently disagreed with Mr. Bach's trial strategies. The district court found Mr. Bach had acted on behalf of his client, and filed the relevant motions. We conclude that the district court did not abuse its discretion in denying the motion. Accordingly, the district court is affirmed.

### D. *Admission of Georgia Prison Identification Card*

■ Johnson also contends that the district court erred in admitting his Georgia prison identification card because the probative value of the prison card was substantially outweighed by its prejudicial value. The court reviews the district court's decision to admit the card for abuse of discretion. *United States v. Chin,* 83 F.3d 83, 87 (4th Cir. 1996).

In the instant case, Campbell during his testimony referred to the second robber as having once been incarcerated in the Georgia Department of Corrections. Immediately following his testimony, the district court issued the following instruction:

All right, members of the jury. That testimony is admitted not—it is not evidence of any substantive elements of the offense, but, if connected later, is admitted solely on the issue of the identification of the [Johnson].

Subsequently, the government presented the testimony of Special Agent Womble of the FBI, who testified about the arrest of Johnson at an area hotel, and items recovered from the hotel room after the officers searched the room. During his testimony, Agent Womble mentioned that Johnson's Georgia prison identification card was recovered from the room. Once again, the district court instructed the jury:

Members of the jury, you will recall that testimony regarding Georgia and the Department of Corrections has been admitted solely on the issue of identification of[John-son]. This is in connection with that and may not be considered by you as probative of any of the substantive issues which the [g]overnment's required to prove, but is admissible and may be considered by you only on the question of whether [Johnson] has been identified.

Johnson concedes that the Georgia prison identification card "was admissible under Federal Rule of Evidence 404(b) to show the identity of the [Johnson]," but nevertheless, bases his argument on Rule 403 arguing that the prejudicial effect of the card outweighs its probative value.

■ Here, the district court gave two limiting instructions immediately following both Campbell's and Womble's testimony about Johnson's prior incarceration in Georgia and his prison identification card. As this court recognized in *United States v. Jones,* 907 F.2d 456 (4th Cir.1990), *cert. denied,* 498 U.S. 1029, 111 S.Ct. 683, 112 L.Ed.2d 675 (1991), "[t]he jury is generally presumed to be able to follow an instruction to disregard evidence, absent some strong indication that the evidence is so powerful that a jury could not ignore it and that the defendant would be harmed as a result." *Id.* at 460 (citing *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)). The testimony surrounding Johnson's prison identification card does not rise to that level. Thus, the district court did not abuse its discretion in admitting the identification card under Rule 403. Therefore, the district court's admission of the identification card is affirmed.

### E. *Career Offender*

■ Finally, Johnson challenges the district court's sentencing of him as a career offender, pursuant to U.S.S.G. § 4B1.1, on the grounds that Johnson's prior conviction for assault on a female, which at the time of Johnson's conviction carried a maximum penalty of two years, can not be used in the career offender analysis because that offense now carries only a 150 days maximum. The court reviews the district court's designation of Johnson as a career offender *de novo. United States v. Dickerson,* 77 F.3d 774, 775 (4th Cir.1996).

U.S.S.G. § 4B1.1 provides:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a

controlled substance offense, and (3) the defendant has at least *two prior felony convictions* of either a *crime of violence* or a controlled substance offense.

(Emphasis added). The term crime of violence is defined as "any offense under federal or state law punishable by imprisonment for a term exceeding one year...." U.S.S.G. § 4B.1.2(1). "Two prior felony convictions" means:

(A) the defendant committed the instant offenses subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense ..., and (B) the sentences for at least two of the aforementioned felony convictions are counted separately under the provisions of § 4A1.1(a), (b), or (c). *The date that a defendant sustained a conviction shall be the date that the guilt of the defendant has been established,* whether by guilty plea, trial, or plea of *nolo contendere.*

(Emphasis added).

At the time of Johnson's conviction for assault on a female, the statutory maximum was two years. In 1994, however, the North Carolina legislature amended the assault on a female offense and others, reclassifying them as class A1 misdemeanors carrying a maximum period of incarceration of 150 days. *See* N.C. Gen.Stat. § 14–33 note (Supp.1996), 15–A–1340.23 note (Supp.1996). Thus, Johnson argues that North Carolina's recent amendment renders his prior conviction ineligible for career offender calculations.

 The issue presented in the instant appeal appears to be one of first impression for the federal courts. Guided by the language of the guideline and the accompanying notes a rejection of Johnson's position is dictated. Section 4B1.1 provides that a person may be considered a career offender if the defendant has two prior felony convictions. As stated above a felony conviction is one for which the substantive offense provided for imprisonment exceeding one year. As for the date of the conviction, § 4B1.2(3) of the guidelines provides that the conviction is sustained *on the date the guilt of the defendant is established.* Johnson *sustained* his conviction for assault on a female in 1986. In 1986, assault on a female was punishable by a statutory maximum of 2 years. Thus, Johnson's assault conviction is properly considered a *prior felony conviction* for guideline purposes.

 Furthermore, the plain language and accompanying application notes do not provide any support for Johnson's notion that the nature of the conviction at the time of sentencing, rather than at the time of conviction, controls the career offender analysis. From a practical standpoint, acceptance of Johnson's argument would interject uncertainty into the sentencing process because district courts would be required to check each prior felony conviction to see whether at the time of sentencing as a career offender, the prior conviction would still classify as a felony. Johnson seeks to garner the windfall created as a result of the North Carolina's legislature's actions.

In 1986, when Johnson was convicted of assault on a female, no one disputes that his exposure was for more than a year. Neither does Johnson dispute that but for North Carolina's legislature's actions, consideration of his prior conviction for assault on a female would be proper for career offender purposes. Because the language of the guideline hinges upon the date the conviction was sustained, we hold that for career offender calculation purposes, the date the prior conviction was sustained should control, not the date of later sentencing as a career offender.

### CONCLUSION

For the reasons expressed, the judgment of the district court is

*AFFIRMED.*