**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 04-4001**

───────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

WILLIAM QUINZEL THOMAS,

Defendant - Appellant.

───────────────

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. Samuel G. Wilson, District Judge. (CR-02-20)

───────────────

Argued: March 18, 2005                    Decided: April 27, 2005

───────────────

Before WILLIAMS, MOTZ, and DUNCAN, Circuit Judges.

───────────────

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

───────────────

**ARGUED:** Krysia Carmel Nelson, Charlottesville, Virginia, for Appellant. William Frederick Gould, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Roanoke, Virginia, for Appellee.

───────────────

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

William Quinzel Thomas, convicted by a jury of conspiracy to knowingly and intentionally distribute and possess with intent to distribute 50 grams or more of cocaine base or crack, appeals.  He asserts pretrial, trial, and sentencing errors.  We vacate his sentence and remand the case for resentencing; in all other respects, we affirm.

## I.

Around 10:00 am on September 8, 2001, Officer Mark Warner of the Front Royal Police Dept. responded to a dispatch report of drug dealing on Pine Street in an area of Front Royal known to be a hotbed of drug activity.  The tip identified four black males in a tan van.  When Officer Warner arrived in the area, he saw three black males in a gold SUV parked in front of 327 Pine Street, a house reputed to be the site of frequent drug-dealing.  He approached the vehicle and asked the three men to identify themselves.  They each gave the officer a name, one of which turned out to be false, but said they had no identification.  None admitted to being the driver of the vehicle.

A man then exited 327 Pine Street.  He identified himself as William Thomas, said he was the driver of the vehicle, and gave Officer Warner a Maryland driver's license. Officer Warner called dispatch to check the license through the Maryland DMV, which

2

reported that it was suspended. Still another person then came out of the house and said that he owned the car. When Officer Warner asked him for identification, he said he had none, but he gave a name and date of birth, which the officer ran through the DMV. After the name and date of birth did not match any records in Maryland, the individual admitted he had lied, and gave the Officer his driver's license, which identified him as Arnold Jackson. In response to Jackson's question, Officer Warner informed Jackson that he was investigating a report of drug dealing. (JA 74). Jackson denied that he was dealing, and proposed that the officer search the car.

The three men in the car exited it. Officer Warner found $1500 in the glove compartment and an electronic scale with white residue on it. Officer Warner then searched all five of the men. He found over $2500 in various pockets of Jackson's pants, over $350 on another of the men, and less than $10 each on Thomas and the remaining two men. Warner then took photographs of each of the men and told them they were free to go.

On March 11, 2003, authorities arrested Thomas and charged him, pursuant to 21 U.S.C.A. § 846 (West 1994), with conspiracy to distribute and possess with intent to distribute 50 grams or more of crack in violation of 21 U.S.C.A. § 841(a)(1) (West 1994). Before trial, Thomas applied, pursuant to 18 U.S.C.A. 3006A(e) (West 2000 & Supp. 2004), for the court to appoint a medical

3

expert.  The court denied the request.   Thomas also moved to suppress evidence obtained as a result of the September 8, 2001 search; the court denied that motion, as well.

At trial, several convicted, crack-using co-conspirators -- Charles Hackley, Patrick Robinson, Michael Robinson, Barry Thompson, Aurelio Lopez, and Percola Fitzhugh -- identified and testified against Thomas.  Authorities had apparently shown each of them the September 8 photograph Officer Warner had taken of Thomas. Thomas objected to the in-court identifications, asserting that the out-of-court identifications were impermissibly suggestive, but the district court overruled his objections.   In addition, Thomas unsuccessfully objected to admission into evidence of car rental records that purported to show that the gold SUV, had been rented to Jackson's wife.

After a three day trial, the jury convicted Thomas of the charged conspiracy.   The district court found that Thomas was responsible, as a member of the conspiracy, for at least 500 grams of crack, and therefore sentenced him under the then-mandatory U.S. Sentencing Guidelines to 330 months in prison, 60 months supervised release, and a $100 special assessment.

II.

Thomas argues that the district court erred in two pretrial rulings: (1) denial of his request to appoint a medical expert and (2) denial of his suppression motion.  Both arguments fail.

A.

Thomas sought authorization to obtain a medical expert to testify on the effect of drug addiction on perception and memory, in order to attack the credibility of the six drug addicts who testified against him.

Federal law entitles indigent defendants to expert services that are "necessary for adequate representation."  18 U.S.C.A. 3006A(e)(1).  We review for abuse of discretion a district court's decision regarding the necessity of the services.  United States v. Hartsell, 127 F.3d 343, 349 (4th Cir. 1997).  "To show reversible error in a district court's refusal to appoint an expert, a defendant must demonstrate that the court's refusal was prejudicial to his defense."  United States v. Perrera, 842 F.2d 73, 77 (4th Cir. 1988).

In this case, Thomas has not demonstrated prejudice from denial of his request.  As the Government notes, Thomas' counsel ably cross-examined the witnesses on their addiction and their memory.  Moreover, the court instructed the jury that "the testimony of one who is shown to have used addictive drugs during the period of time about which he testified . . . must always be

5

examined and weighed . . . with greater care and caution than the testimony of ordinary witnesses."

Furthermore, each of the testifying co-conspirators were well-acquainted with Williams. The Robinsons had known Thomas since childhood; Hackley saw Thomas "every time [he] would come down to Front Royal" and bought from him repeatedly; and Fitzhugh and Lopez were familiar with Thomas because they had seen him several times. In light of this evidence of familiarity, the cross-examinations, and the court's instruction, it is particularly unlikely that lack of expert testimony on the effect of crack on memory prejudiced Thomas.

B.

Thomas also challenges the denial of his motion seeking to suppress all evidence gathered by Officer Warner on September 8, 2001, in front of 327 Pine Street. He maintains that Officer Warner illegally stopped the SUV and so the fruit of this illegal stop must be suppressed.

He argues that Officer Warner's initial questioning was a seizure and that it was unsupported by reasonable suspicion. A seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would feel he was not free to leave." California v. Hodari D., 449 U.S. 621, 628 (1991) (quoting United States v. Mendenhall, 446 U.S. 544, 555 (1980) (opinion of Stewart, J.)). Thomas contends that the fact that

6

Warner "accused Thomas and Jackson of dealing drugs out of the vehicle" and then took Thomas' driver's license and "did not immediately return it" indicate that Warner's behavior constituted "a show of authority sufficient to make it apparent that [Thomas] [was] not free to ignore [Warner] and proceed on his way." United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989) (internal quotation marks and citation omitted).

But Gray, which outlines factors courts have examined in determining whether an officer has made that show of authority does not assist Thomas. Gray does teach that two factors that bear examination are (1) an officer's statement that he "positively suspect[s] [the defendant] of illegal activity" and (2) an officer's failure to promptly return requested identification. Id. at 322-23.

Contrary to Thomas' contentions, he produced evidence of neither of these factors. Officer Warner never stated that he "positively suspected" Thomas of illegal activity. Rather, the Officer said, in response to co-conspirator Jackson's question, that the police had "received a call, a complaint that there was possible drug dealing going on through [the] vehicle." And, Thomas makes no argument that Officer Warner did not "promptly return" Thomas' identification, rather, he complains that it was not "immediately return[ed]." Brief of Appellant at 26. However, there is no indication that Officer Warner retained the license any

7

longer than necessary to determine its validity. See United States v. Analla, 975 F.2d 119, 124 (4th Cir. 1992) (noting that keeping a license for the amount of time necessary to check it with the dispatcher does not convert an encounter with police into a seizure).

Moreover, since the rental records show that Thomas was not an authorized driver of the rental car, he had no reasonable expectation of privacy in the vehicle, and thus cannot challenge the legality of Officer Warner's search of the vehicle. See United States v. Wellons, 32 F.3d 117, 119 (4th Cir. 1994). Indeed, even in the absence of the rental records evidence, it is clear Thomas could not have been a legally authorized driver of the car, because he did not have a valid driver's license.

Finally, it is undisputed that Jackson, who said he owned the car, and whose wife actually rented the car, both consented to Officer Warner's search of the vehicle. That search revealed an electronic scale with "white residue" on it and $1500. Only after this material was discovered did Officer Warner search Thomas and take his picture. At that point, the search was supported by reasonable suspicion.

III.

Thomas also challenges two trial rulings. Specifically, he argues that the district court erred in permitting six in-court

8

identifications of him and admitting the car rental records.  These challenges, too, are meritless.

## A.

The district court overruled Thomas' objection that the in-court identifications of Thomas were based on impermissibly suggestive out-of-court identifications.  In the out-of-court identifications, the witnesses had been shown a single picture of Thomas or a series of pictures, of which Thomas' was one, laid out one at a time.[1]

The district court addressed the objection only once, prior to Hackley's testimony, and found that Hackley's identification was based on Hackley's familiarity with Thomas and was therefore independent of the out-of-court identification.  The extent to which a witness knew Thomas is a factual question reviewed for clear error.  We review the district court's legal conclusions regarding the admissibility of in-court identifications de novo. United States v. Burgos, 55 F.3d 933, 941 (4th Cir. 1995). However, the party challenging admissibility bears the burden of

---

[1]Thomas repeatedly asserts in his brief that the officer who showed the pictures to the witnesses asked them, "What can you tell me about this guy's drug dealing?"  Brief of Appellant at 9, 36, 40, 43.  However, no witness testified to that sort of leading question.  Rather, Thomas' counsel characterized the question that way when she cross-examined Hackley.  Investigator Coffman, the man who interviewed the witnesses, simply testified, "I put the picture down and just said, do you know this person."

proof.  United States v. Johnson, 114 F.3d 435, 441 (4th Cir. 1997).

An eyewitness identification at trial following a pretrial identification by photograph will be suppressed "only if the photographic identification procedure was so impermissibly suggestive as to give rise to the very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 348 (1968).  We engage in a two-step analysis, first determining whether the pretrial identification was impermissibly suggestive; and, only if it was, assessing whether the identification was nevertheless reliable based on the totality of the circumstances.  Johnson, 114 F.3d at 441.

The use of a single photograph is disfavored.  See, e.g., Manson v. Braithwaite, 432 U.S. 98, 117 (1977); Simmons, 390 U.S. at 383.  However, in Burgos, we noted that, if a witness knows the defendant personally, "the chance of misidentification from a . . . suggestive photo display is virtually non-existent."  55 F.3d at 942; see also United States v. Morsley, 64 F.3d 907, 917 (4th Cir. 1995).  That is precisely the situation here.

The Government introduced evidence that Hackley had known Thomas since 2001 and had dealings with him repeatedly when Thomas came to Front Royal (JA 225, 239).  Patrick and Michael Robinson had known Thomas since they were children and lived in the same neighborhood.  Patrick had bought crack from Thomas seven or eight

10

times, and Michael had repeatedly seen Thomas dealing drugs and had bought crack from Thomas twice in Front Royal and once in Washington, D.C. Percola Fitzhugh apparently had the beginnings of a romantic relationship with Thomas and purchased cocaine from him. Barry Thompson bought crack from Thomas, then drove Thomas to the store and took some of Thomas' crack to sell. Aurelio Lopez, who knew Thomas through Thomas' brother Jackson, had seen him "on different occasions" and bought crack from him once.

Thus, as in Burgos, the "in-court identifications . . . were based on far more than a brief glimpse, five minutes of study, or an overly suggestive photograph display." 55 F.3d at 942. Rather "[c]lear and convincing evidence exists that the . . . in-court identifications derived from an independent origin." Id. at 942-3.

B.

Thomas argues that Enterprise Car Rental records showing, inter alia, that he was not an authorized driver of the gold SUV searched on September 8, 2001, should not have been admitted because they were not properly authenticated.

Federal Rule of Evidence 902(11) sets forth the requirements for self-authentication of a business record. A domestic record of regularly conducted business activity must be accompanied by a declaration certifying that the record

> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (B) was kept in the course of the regularly conducted activity; and (C)

11

was made by the regularly conducted activity as a regular practice.

Federal Rule of Evidence 902(11).[2]

The Advisory Committee Notes state that the rule is satisfied by a declaration that comports with 28 U.S.C. § 1746, which states that an unsworn declaration "in writing of [declarant] which is subscribed by him, as true under penalty of perjury, and dated" is sufficient. 28 U.S.C.A. § 1746 (West 1994).

Here, the text of the typewritten declaration met the requirements of both FRE 902(11) and § 1746 verbatim. Originally, it was signed and dated by Linda Nelson, who also notarized it. On the version admitted into evidence, Linda Nelson's name and signature had been crossed out, and the declaration was signed and dated by Timothy Zaff. It does not appear to have been re-notarized. However, § 1746 does not require a notarized statement. See 28 U.S.C. § 1746; United States v. Moore, 24 F.3d 624, 626 n.3

---

[2]The rule also requires the party offering the evidence to provide written notice to the adverse parties of the intention to use the document and to make the document available to them so that they can challenge it. Federal Rule of Evidence 902(11). On appeal, Thomas contends that he was not given sufficient notice of these records. Thomas raised this objection at the suppression hearing, and the court marked the records for identification purposes only, but at trial, Thomas objected to the records solely because of asserted improper notarization. Even if Thomas had preserved his objection as to alleged lack of notice, the objection is meritless. Thomas had notice of the intended use of the records on the afternoon of Friday, August 15, 2003, at the latest. The trial began on Monday, August 18, 2003. The records were offered and entered into evidence on Tuesday, August 19, 2003. Thomas had sufficient time to test the adequacy of the foundation in the declaration.

(4th Cir. 1994) (noting that FRAP 4(c) is satisfied by a declaration complying with 28 U.S.C. § 1746 <u>or by a notarized statement</u>); <u>Summers v. United States Dept. of Justice</u>, 999 F.2d 570, 573 (D.C. Cir. 1993) (noting that requiring notarization "would render § 1746 essentially a dead letter and end-run Congress' clear intent of sparing individuals the cost and hassle of notarizing routine submissions"). Furthermore, even if the declaration did not strictly comply with Rule 902(11) or § 1746, any error in its admission would be harmless given the very collateral nature of the rental records to the crime charged against Thomas in this case.

IV.

Finally, Thomas challenges his sentence. We agree that his sentence was imposed in violation of the Sixth Amendment. <u>See</u> <u>United States v. Booker</u>, 125 S. Ct. 738, 746 (2005). Accordingly, we vacate Thomas' sentence and remand this matter for resentencing. <u>See</u> <u>United States v. Hughes</u>, 401 F.3d 540, 556 n.15 (4th Cir. 2005).

Because Thomas raised his Sixth Amendment contention for the first time on appeal, it is subject to review for plain error only. <u>See</u> <u>id.</u> at 547. As set forth in <u>United States v. Olano</u>, the plain error mandate is satisfied if: (1) there was error; (2) it was plain; and (3) it affected the defendant's substantial rights. 507

13

U.S. 725, 732 (1993).  If these conditions are met, we may then exercise our discretion to notice the error, but only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings."   Id. (internal quotation marks and alteration omitted).  The Olano conditions are satisfied here.

First, the prison term imposed on Thomas constituted error under Booker.  See 125 S. Ct. at 755-56 (holding Sixth Amendment contravened when sentencing court, acting pursuant to Guidelines, imposes sentence greater than maximum authorized by facts found by jury alone).  Under the then-mandatory Guidelines regime, the jury verdict finding Thomas guilty of conspiracy to distribute 50 grams or more of crack cocaine supported an offense level of 32, resulting in a sentencing range of 168 to 210 months.  However, the court's findings that Thomas was responsible for more than 500 grams of crack and that he carried a firearm increased Thomas' offense level to 38, yielding a sentencing range of 324 to 405 months.  Pursuant to Booker, the court erred in relying on its own fact-finding to impose a sentence of more than 210 months.  See Hughes, 401 F.3d at 547 (recognizing that imposition of sentence "in part based on facts found by the judge . . . constituted error").

Second, although Thomas' Sixth Amendment contention was foreclosed by our precedent at the time of his sentencing, Booker has since "abrogated our previously settled law," rendering the

14

error plain. Hughes, 401 F.3d at 548. And third, the error was prejudicial, in that the sentence imposed on Thomas -- 330 months -- was greater than the 210-month maximum authorized by the facts found by the jury alone. See id. at 548-49.

Finally, to affirm Thomas' sentence despite the error would seriously affect the fairness, integrity, or public reputation of these judicial proceedings. In the wake of Booker, the Guidelines are to be treated as advisory (rather than mandatory), and sentences that fall within the statutorily prescribed range are reviewable only for reasonableness. Id. at 546 (citing Booker, 125 S. Ct. at 765-68). The record before us does not indicate what sentence the court would have imposed on Thomas had it exercised its discretion under 18 U.S.C. § 3553(a) and treated the Guidelines as merely advisory. Although it is possible that Thomas will receive the same sentence on remand, "[t]his possibility is not enough to dissuade us from noticing the error." Hughes, 401 F.3d at 556. We, therefore, vacate Thomas' sentence, and remand for resentencing consistent with Booker and its progeny.


V.

Pursuant to the foregoing, we affirm Thomas' conviction, vacate his sentence, and remand for resentencing.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

15