**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

MICHAEL WAYNE ALLEN, a/k/a
Anthony Washington,
<u>Defendant-Appellant.</u>

No. 97-4100

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
William L. Osteen, Sr., District Judge.
(CR-96-124)

Argued: May 8, 1998

Decided: September 28, 1998

Before ERVIN and MOTZ, Circuit Judges, and BEEZER,
Senior Circuit Judge of the United States Court of Appeals
for the Ninth Circuit, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Motz wrote the
opinion, in which Judge Ervin and Senior Judge Beezer joined.

_____

**COUNSEL**

**ARGUED:** James Donald Cowan, Jr., SMITH, HELMS, MULLISS
& MOORE, L.L.P., Greensboro, North Carolina, for Appellant.
Michael Francis Joseph, Assistant United States Attorney, Greens-
boro, North Carolina, for Appellee. **ON BRIEF:** John J. Korzen,

SMITH, HELMS, MULLISS & MOORE, L.L.P., Greensboro, North Carolina, for Appellant. Walter C. Holton, Jr., United States Attorney, Greensboro, North Carolina, for Appellee.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

Michael Wayne Allen, convicted of possession of crack cocaine with intent to distribute, asserts that the district court erred in denying his motion to suppress evidence on the basis of the inevitable discovery doctrine. Because the doctrine does not apply here, we must reverse and remand for further proceedings.

I.

Police arrested Allen at a Greensboro, North Carolina, bus terminal on June 12, 1996, for possession of marijuana and crack cocaine. The grand jury indicted him on a single count of possession of crack with intent to distribute, in violation of 21 U.S.C.A.§§ 841(a)(1) and (b)(1)(A) (West 1981 & Supp. 1998). Soon thereafter Allen moved to suppress evidence obtained from a search of his duffel bag and statements concerning the evidence made to the police after his arrest.

At the initial hearing on the motion to suppress, the government presented the testimony of local police detectives Angela Tackett and James Anders, and the testimony of Drug Enforcement Agent Cynthia Wilcox. Tackett testified first. She told the court that she and other officers of a cooperative drug interdiction task force were working at the bus terminal on the day they arrested Allen. After Allen's bus arrived, and after several passengers, including Allen, left the bus to enter the terminal, Tackett and Anders boarded the bus to interview passengers. As the driver announced that the bus was about to depart, Allen re-boarded the bus. Tackett identified herself as a police officer and asked if Allen had any bags with him. When he pointed to a black knapsack on the overhead rack, Tackett took the bag down and asked Allen if it was his. He responded, "Yes." Tackett testified that she then asked Allen, "Do you have any other bags anywhere on the bus?," to which Allen allegedly replied, "No."

2

Tackett further testified that she then asked Allen if she could search the knapsack, and Allen consented. As she searched the knapsack, Tackett located a clear plastic bag with a substance later identified as marijuana. When Allen moved to leave the bus, Anders and State Bureau of Investigation Agent Kaplan arrested Allen, handcuffed him, escorted him to the parking lot, and administered <u>Miranda</u> warnings.

Tackett and Kaplan continued questioning the other passengers, and attempted to identify the owner of each of the bags inside the bus. They identified all of the bags except one -- a large black duffel bag located toward the rear of the bus, well away from Allen's seat. Tackett asked each of the remaining passengers if he or she owned the bag, and each said no. Tackett testified that she thereafter searched the duffel, "treat[ing] it as an abandoned bag because nobody claimed it."

Upon searching the duffel bag, Tackett found a package of crack cocaine and a train ticket in the name of "Anthony Washington." Tackett left the bus and spoke with the officer watching Allen, who told her that Allen had given him "Anthony Washington" as his name. (Allen was traveling under the alias of "Anthony Washington," but was later identified by his fingerprints as Michael Wayne Allen.) Tackett then asked Allen if the duffel bag was his, and he replied, "No." At that point Allen also denied ownership of the black knapsack he originally admitted to owning. Allen was then taken to the DEA office.

On cross examination, and during examination by the district court, Tackett acknowledged that neither her pre-search question regarding bags other than the knapsack nor Allen's alleged response that he had no bags other than the knapsack were reflected in the government's affidavit submitted at Allen's initial detention hearing or in the official government incident report, both of which DEA Agent Wilcox had prepared. In response to a direct question from the district court, Tackett testified that she did not make any written report of the incident; she explained, "I verbally gave my information to Agent Wilcox, and she wrote the report."

The affidavit prepared by Wilcox and submitted by the government at the detention hearing held the day after Allen's arrest states:

3

[Allen] was observed to get off the bus, go inside the terminal and then return to his seat on the bus. Detective Tackett, accompanied by Detective Anders, identified herself as police officer and asked where [Allen] was traveling from. He stated he was coming from New York to Charlotte. Detective Tackett than asked if [Allen] had any bags aboard the bus and he said "Yes" and pointed above his head to a black leather knapsack. Detective Tackett removed the knapsack from the overhead area and asked if it was [Allen's]. [Allen] replied "Yes". Detective Tackett requested permission to search the bag and [Allen] answered in the affirmative. Inside the bag Detective Tackett found a clear plastic bag containing 198.8 grams (gross) of a green vegetable matter, suspected marijuana. [Allen] then attempted to leave the bus, struggled with officers briefly, and was arrested and handcuffed by Detectives Anders and Kaplan. Detective Tackett found on [Allen] a Greyhound Bus ticket receipt showing travel from New York to Charlotte, NC for June 12, 1996 in the name A. WASHINGTON.

Detectives Tackett and Kaplan finished speaking with passengers and found a black nylon duff[el] bag on the bus which no one, including [Allen], claimed. Detective Tackett searched the bag as an abandoned bag and found 211.1 grams (gross) of an off-white rock substance, which field tested positive, by affiant, for crack cocaine.

Wilcox's incident report, which was dated June 17 (five days after the arrest) and introduced as an exhibit at the suppression hearing, contains a virtually identical account. Neither written version states that, prior to searching the knapsack, Tackett asked Allen if he had any bags other than the knapsack or that Allen denied having any other bags.

During his testimony, Detective Anders stated that, prior to any search, Tackett did ask Allen if he had any other bags on the bus and Allen replied he did not. At one point, however, Anders testified that Tackett asked about other bags after she searched the knapsack. Subsequently, Anders disavowed this sequence.

4

DEA Agent Wilcox then took the stand. Wilcox was not at the bus station during the arrest, but Allen was taken to her office from the station. After being advised of his Miranda rights once again, Allen agreed to speak with Wilcox. Allen told her that he was transporting the crack to some people in Charlotte in exchange for a $2000 fee. But because Wilcox would not promise him probation, Allen refused to give the names or description of the people in Charlotte.

As to her incident report, Wilcox explained that Tackett had "clarified with [Allen] that [the] backpack was the bag that he claimed was his, and that that was the only bag he had." Wilcox further testified that when Tackett saw the incident report, Tackett asked why Wilcox had not included Tackett's question to Allen regarding any bags other than the knapsack. Wilcox told Tackett that it was covered by the statement in the report that "no one, including[Allen], claimed [the duffel bag]."

Wilcox also testified, however, that when she debriefed Tackett on the day of Allen's arrest she asked Tackett "to make some notes also, which [Tackett] did," and that she wrote her report "from the notes that [Tackett] gave [her]." Moreover, Wilcox acknowledged that her report did not specifically recount Tackett's alleged conversation with Allen regarding any bags other than the knapsack. Wilcox explained that the events listed in her report did not necessarily reflect an exact sequential order, but, because the report "is a synopsis . . . not meant to be a total recreation in any way," the report listed the events in general chronological order. Later, Wilcox conceded that, as far as she was "aware," when Tackett asked Allen if he had any bags Allen pointed to the knapsack and said, "Yes," but he did not say anything else. She explained that, in her view, Allen's response "spoke for itself: `This is my bag.' When you're asked if you have any bags, if you had more than one, you would say you had more than one, and get them, if you have any bags." Following this answer the court questioned Wilcox. Wilcox responded that, in her view, if a person is asked if he has any bags, answers yes, and then points to one, the police can assume his response means that one is his only bag and he has disavowed ownership of any others.

At the conclusion of the hearing, the prosecutor argued that Allen had denied having any bags other than the knapsack and this consti-

5

tuted abandonment of the duffel. Allen maintained that he had not abandoned the duffel because he had not denied having any bags other than the knapsack before the search. The court held its decision in abeyance pending additional briefing by Allen on an issue not raised on appeal. The court also requested that Wilcox produce the notes Tackett had made during their conversation. The record before us does not contain these notes, but the district court obviously placed great importance on their existence and substance, repeatedly referring to the notes in its ultimate ruling on abandonment. No party challenges their authenticity or the district court's reliance on them.

The district court conducted another suppression hearing ten days later. At the outset, the court noted it had previously informed the parties that "it would be appropriate to hear evidence on inevitable discovery." The district judge explained that this hearing was required because "I reviewed the file and transcript of our proceedings [at the initial suppression hearing] again, and [found that] there was, to say the least, several different versions of what happened here. It is my belief . . . that it would not be proper for me to find that everything that is necessary to the legal discovery of the second bag [i.e., the search of the duffel bag on the basis of abandonment] is in evidence with a credible background to it."

The court then went on to make extensive findings as to the numerous "conflicts in testimony that caus[ed it] difficulty." The court noted that Wilcox's affidavit did not indicate that, prior to the search, Tackett asked Allen if he had any bags other than the knapsack. Further, the court found that Detectives Tackett and Anders had testified to inconsistent versions of the events prior to Allen's search and arrest. Finally, the court pointed out that although Tackett had testified she did not make any written report, but simply "verbally" gave her report to Wilcox, actually Tackett did make, if not a report, a written narrative.

Turning to Tackett's narrative, the court made the following findings:

> The notes or report, whichever you want to call it, of Detective Tackett, says that she removed the bag from the overhead. And I asked him, "Is this yours? Is this one yours?"

6

> And he replied, "Yes" "And I asked him if I could search it," and he replied "Yes." "As I was opening the bag" -- and she goes on to say what happened from that point on. Detective Anders grabbed [Allen]. [Allen] began to struggle. [Anders] took [Allen] off the bus and arrested him. And Detective Anders and Kaplan had him outside. Two of them went back on the bus, including Detective Tackett. "I asked if the bag then found belonged to anybody on the bus, and no one claimed the bag."
>
> That is the first indication, in this view[Tackett's written notes], of any inquiry about the other bag on the bus. According to these notes, Mr. Washington -- Mr. Allen was off the bus at that time. And I see no way for him to have heard that inquiry. These notes simply indicate a corollary to the original affidavit filed in this case.

(Emphasis added). The court concluded that it

> c[ould] not find . . . by even a preponderance of the evidence that [Allen] was asked, at the time that his original bag was found, and [at the time] he consented to the search of that bag, . . . if there was any other baggage on the bus that belonged to him. Being unable to make that finding, the Court cannot find an abandonment by the defendant at that time.

The district court then heard testimony on whether the cocaine in the duffel inevitably would have been discovered despite the unlawful search. Once again, Detective Tackett started off. The prosecutor asked her these questions and received these answers:

> Q: [I]f you thought that the bag could have been [Allen's] bag, and you had no further information about whether the bag was the defendant's bag or not, what would you have done with that bag?
>
> A: I could have had a K-9 dog run over it, smell it.
>
> Q: And is that what you would have done?

7

> A: Had he not made the statement to me that he had no other bags, I would have run a dog over it.

Tackett also stated that if the dog had alerted she would have applied for a search warrant to search the duffel.

Tackett acknowledged that she had never brought a dog on a bus in the past. In response to examination by the court, she stated that the policy of the interdiction task force was to identify all bags on a bus. With regard to an unidentified bag, Tackett said, "[i]f we have a bag no one claims, then it is considered an abandoned bag." Tackett testified that she would not leave an unclaimed bag on the bus: "[i]f we have an unclaimed bag, it is abandoned and we search it." Finally, she conceded that she did not know the bus company's policy as to unclaimed bags.

Local police detective Kenneth Kennedy testified that he was present at the bus station that day, along with his drug detection dog. Kennedy stated that his dog had successfully detected drugs over 160 times, and that the dog would have no problem detecting the cocaine at issue here, even though packaged in plastic and located inside the duffel bag. Kennedy recounted that on the day of Allen's arrest he had used the dog to search the luggage compartments located in the undercarriage of the bus. Once the search of the compartments turned up negative, he returned the dog to the car and left shortly thereafter. He acknowledged that no one asked him to take the dog on the bus, and that typically he confined the dog's search to the undercarriage of a bus, as he had that day.

Wilcox testified last. She stated that, in her experience, unclaimed bags are searched as abandoned bags and then turned over to the bus station rather than returned to the bus. Like Tackett, Wilcox did not know what the policy of the bus company or the station would be as to unclaimed bags.

The district court concluded that the cocaine in the duffel bag inevitably would have been lawfully discovered, and thus denied the motion to suppress. The court reasoned as follows:

8

> The Court will find that based upon the evidence in this case, that first of all the officers asked all of the other passengers on the bus to identify their bags. All baggage was, in fact, identified, except the one bag in the back, which no one on the bus claimed. At that point, excluding the understanding that the officers may have had about what conversation took place earlier, it seems that the baggage, to this Court, would have been subject to the inevitable discovery. . . . [S]ince there was nothing said [by Allen], the inevitable discovery would have [ ] taken place because the officers said they would not have left an unattended, unidentified bag on the bus. They had the dog there for purposes of assistance, if such assistance was needed, and the dog was nearby and could have been called upon to assist. There was ample evidence that this would have been discovered, even though they may not have had, as this Court has held, a consent to search the baggage or an abandonment of the baggage before it was searched.

(Emphasis added).

II.

Allen asserts the Government failed to demonstrate that the evidence of the cocaine inevitably would have been discovered, and that to allow the inevitable discovery exception to apply here would "frustrate[ ] the purpose of the exclusionary rule." Brief of Appellant at 7.[1]

We review the legal conclusions involved in the district court's ruling on a motion to suppress de novo. The factual findings are reviewed for clear error. See United States v. McKinnon, 92 F.3d 244, 246 (4th Cir. 1996). Where mixed questions of law and fact are involved, the ultimate conclusion is reviewed de novo, with the evidence construed in the light most favorable to the party that prevailed below. See United States v. Elie, 111 F.3d 1135, 1140 (4th Cir. 1997); United States v. Han, 74 F.3d 537, 540 (4th Cir. 1996).

_____

[1] Allen does not assign any error to the detectives' consensual search of his knapsack.

9

We note at the outset that the only issue before us is the propriety of the district court's inevitable discovery holding. Another judge might well have resolved the abandonment question differently. But, as the Government acknowledged at oral argument, it made no claim in its appellate brief that the district court erred in rejecting the abandonment argument.**2** Nor, in view of the inconsistencies in the evidence and the deference due an experienced trial judge's assessment of the demeanor and credibility of the witnesses, can we conclude that the findings made in support of the court's abandonment ruling constituted clear error. Accordingly, we turn to the inevitable discovery question.

The Supreme Court first adopted the inevitable discovery doctrine in <u>Nix v. Williams</u>, 467 U.S. 431 (1984). The Court held that information obtained by unlawful means is nonetheless admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." <u>Id.</u> at 444 (emphasis added). In <u>Nix</u>, the police persuaded a criminal defendant to inform them where the body of a child the defendant had murdered was located. <u>Id.</u> at 435-36. The interrogation, which occurred after the defendant had been arraigned and had retained counsel, violated the defendant's right to counsel. <u>Id.</u> at 437. The Court concluded that if the government could prove that the evidence inevitably would have been discovered by legal means then "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." <u>Id.</u> at 444.

_____

**2** In a supplemental letter, the government suggested that our holding in <u>Elie</u>, 111 F.3d at 1135, might provide a basis for affirming the denial of Allen's motion to suppress on abandonment grounds. <u>Elie</u> held that the "fruit of the poisonous tree" doctrine does not apply to physical evidence discovered as a result of a statement obtained from a defendant in violation of his <u>Miranda</u> rights. <u>Id.</u> at 1141-42. Although here the district court and counsel did discuss the <u>Miranda</u> warnings given to Allen, the adequacy of those warnings played no part in the court's abandonment holding. As previously noted in the text, the district court rejected the government's abandonment argument because it "could not find by even a preponderance of the evidence" that, prior to the search, Allen had abandoned his baggage. Thus, <u>Elie</u> does not assist the government in this case.

10

The police in <u>Nix</u> had established an extensive search for the child that was only two-and-a-half miles away from the location of the body when called off due to the defendant's statement. The government introduced abundant evidence that the patrol team would have found the body "within a short time" had the search continued. <u>Id.</u> at 437-38 (quoting the trial court). After explaining that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment," <u>id.</u> at 444 n.5., the Supreme Court reviewed this evidence. Agreeing with the express findings of the trial court, the Supreme Court concluded that the evidence demonstrated the body inevitably would have been found and so the trial court had properly applied the doctrine. <u>Id.</u> at 448-50. <u>Cf. United States v. Thomas</u>, 955 F.2d 207, 209-11 (4th Cir. 1992) (inevitable discovery doctrine not applicable when government "relied on a string of conjecture" in its attempt to prove evidence inevitably would have been discovered absent the illegal search).

With these principles in mind, we address the applicability of the inevitable discovery doctrine in the case at hand.

III.

The government argues that if Detective Tackett had not improperly regarded the bag as abandoned and unlawfully searched it, the agents nonetheless would have legally found the cocaine. To reach this conclusion, the government employs the following line of reasoning: (a) if the drug dog had sniffed the duffel bag, the dog would have alerted to the cocaine; (b) if Allen had not disclaimed ownership of other bags, Detective Tackett would have called for the drug dog -- which was on the scene -- to sniff the duffel bag; and (c) if the dog had alerted, the police would have had sufficient probable cause for a search warrant, which they inevitably would have obtained and then used to uncover the cocaine.

A.

Unlike Allen we have little trouble with the district court's finding that, if the duffel bag had been subjected to a sniff test by the drug dog, the dog would have alerted Detective Kennedy to the presence of the cocaine and the dog's alert would have provided probable

11

cause for a search warrant. Detective Kennedy testified without contradiction that his dog alerted on numerous prior occasions without being tricked, and that the packaging at issue here would not pose a problem for the dog. Courts have frequently upheld the use, and, implicitly, the effectiveness of the use, of dogs to ferret out illegal drugs. See, e.g., United States v. Place , 462 U.S. 696, 706-07 (1983); United States v. Frost, 999 F.2d 737, 744 (3d Cir. 1993); United States v. Seals, 987 F.2d 1102, 1106-07 (5th Cir. 1993); United States v. Stone, 866 F.2d 359, 363-64 (10th Cir. 1989); United States v. Alpert, 816 F.2d 958, 960 (4th Cir. 1987); United States v. Attardi, 796 F.2d 257, 259-60 (9th Cir. 1986). But see United States v. Florez, 871 F. Supp. 1411, 1419-22 (D.N.M. 1994) (questioning the reliability of a dog alert as a means to establish probable cause). Indeed, in a case decided by this court only a few years ago, a drug interdiction team working at another North Carolina bus terminal detained another passenger traveling from New York City to subject his luggage to a dog sniff test. "The dog's positive `alert' provided the basis on which a search warrant was issued and the luggage opened." United States v. McFarley, 991 F.2d 1188, 1189 (4th Cir. 1993).

We also reject Allen's suggestion that the government's evidence fails because its dog alert testimony must satisfy the requirements for expert scientific testimony. See Brief of Appellant at 12 (citing Carr v. State, 482 S.E.2d 314 (Ga. 1997)). In Carr, the Georgia Supreme Court determined that a dog handler's testimony concerning the presence of flame accelerants at a suspected arson site was indistinguishable from other scientific tests and analyses. Thus, the court held the handler's testimony subject to the same scientific verifiability requirements because the testimony amounted to expert opinion based on the analysis of data. Id. at 317. In addition to the fact that Carr interpreted Georgia law and so does not bind us, a critical difference exists between the Carr scenario and the probable cause sniff at issue here. In Carr, the evidence of the dog's alert was submitted as substantive evidence of the presence of the accelerant. Id. at 316. In the present case, the dog's alert -- assuming one would occur-- would serve not as actual evidence of drugs, but simply to establish probable cause to obtain a warrant to search for such substantive evidence.

B.

Our initial problem with the district court's inevitable discovery reasoning lies in the lack of evidentiary support for the conclusion

12

that Tackett would have used the dog. We have no doubt that Tackett could have used the dog, but whether she would have presents an entirely different question. Tackett testified specifically that if she had not conducted the illegal search and if she had thought the bag "could have been Allen's," she would have used the drug dog to sniff the bag. However, when Detective Kennedy (the dog's handler) testified, he did not so much as suggest that his dog had ever been used to sniff bags located inside the passenger compartment of a bus. Instead, he stated that his usual duty involved sending his dog into the undercarriage of the bus, as he had done that day. Furthermore, nothing in the record indicates that Tackett had ever previously called for a police dog to sniff baggage inside a bus, and Tackett conceded as much. Both Tackett and Wilcox testified that when a bag went unclaimed the established task force policy was to treat the bag as abandoned and search it, not to run a drug dog over it to establish probable cause to search, or even to establish probable cause by some other means.

Indeed, the district court's inevitable discovery holding is flatly inconsistent with the court's abandonment findings. In concluding that the detectives inevitably would have discovered the cocaine within the duffel bag, the district court necessarily credited Tackett's testimony that if Allen "had not made the statement to [her] that he had no other bags, [she] would have run a dog over [the duffel]." But minutes before, when ruling on abandonment, the court concluded that it could not find "any evidence that [Allen] was asked . . . if [he had] any other baggage on the bus." Thus, the court explicitly found no evidence of the event -- namely, Allen's alleged statement disclaiming ownership of any other bags -- the absence of which Tackett said would have led her to "run the dog over" the duffel and so lawfully discover its contents. Yet, indisputably, Tackett did not "run the dog over" the duffel. She simply opened and searched it. It is impossible to conclude that Tackett inevitably would have used a drug dog if Allen had not disclaimed ownership of any other bags when it is uncontroverted that, in fact, she did not call for a drug dog even though the district court found no evidence that Allen disclaimed ownership of other bags.

A finding of inevitable discovery necessarily rests on facts that did not occur. However, by definition the occurrence of these facts must have been likely, indeed "inevitable," absent the government's mis-

13

conduct. On the record here, particularly in view of the district court's factual findings on the abandonment claim -- findings that the government has not challenged and that we have held are not clearly erroneous -- we cannot possibly conclude that the government inevitably would have discovered the cocaine by employing a drug dog to establish probable cause.

C.

The above discussion disposes of the government's express argument regarding the inevitable discovery doctrine. However, it seems to us that its contention implies an alternate theory that we should, in fairness, address. That is, even without a dog alert the police arguably had probable cause to obtain a search warrant and, absent the unlawful search, they inevitably would have discovered the cocaine through this lawful means.

The police knew that they had found marijuana in Allen's knapsack, that he had traveled from New York (a known drug distribution point), and that other passengers had disclaimed ownership of the duffel.[3] This evidence might have supplied probable cause for a warrant -- if the police had sought a warrant. But even if this evidence does constitute probable cause it does not automatically trigger the inevitable discovery doctrine. The existence of probable cause for a warrant, in and of itself and without any evidence that the police would have acted to obtain a warrant, does not trigger the inevitable discovery doctrine any more than probable cause, in and of itself, renders a warrantless search valid. The inevitable discovery doctrine applies to alleviate "formalistic" and "pointless" applications of the

_____

[3] We note, however, that the testimony of another passenger, Todd Anderson, is irrelevant in this context. Although Anderson testified at trial that he remembered Allen having the duffel bag because he lent Allen a razor in the men's room at an earlier stop, and recollected that Allen experienced difficulty putting the duffel bag in the overhead rack, Anderson did not relate this information to the police until <u>after</u> Tackett had improperly searched the duffel bag. In applying the inevitable discovery exception a court must "view[ ] affairs as they existed at the instant before the unlawful search." <u>United States v. Eng</u>, 971 F.2d 854, 861 (2d Cir. 1992).

14

exclusionary rule, <u>Nix</u>, 467 U.S. at 445, but it does not and cannot eliminate Fourth Amendment protections.

The inevitable discovery doctrine may apply where additional routine or factually established investigative steps would inevitably lead to discovery of the evidence without undertaking any search. <u>Nix</u> and our recent decision in <u>United States v. Melgar</u>, 139 F.3d 1005 (4th Cir. 1998), exemplify this situation. <u>See Nix</u>, 467 U.S. at 444-50; <u>Melgar</u>, 139 F.3d at 1016 n.3 (although defendant revealed his illegal alien status during government interrogation that violated his right to counsel, government inevitably would have discovered defendant's status by running a routine computer check on his false identification card, which had been lawfully obtained prior to interrogation); <u>see also United States v. Gravens</u>, 129 F.3d 974, 979-80 (7th Cir. 1997) (federal agent, who retrieved Firearms Transaction Record using evidence tainted by illegal seizure of gun, inevitably would have discovered the record by going to store's location and manually reviewing store files on the basis of pre-existing evidence), <u>cert. denied</u>, 118 S. Ct. 1333 (1998).

The doctrine also may apply where the facts indicate another search inevitably would have occurred and would inevitably have uncovered the evidence, and that search falls within an exception to the warrant requirement. <u>See, e.g.</u>, <u>United States v. George</u>, 971 F.2d 1113, 1121-22 (4th Cir. 1992) (inventory search); <u>see also United States v. Cotnam</u>, 88 F.3d 487, 496 (7th Cir. 1996) (search incident to arrest).

The doctrine may even apply where the subsequent search that inevitably would have uncovered the disputed evidence required a warrant and the police had probable cause to obtain this warrant prior to the unlawful search but failed to do so, <u>if</u> the government produces evidence that the police would have obtained the necessary warrant absent the illegal search. Such evidence might include proof that, based on independent evidence available at the time of the illegal search, the police obtained and executed a valid warrant subsequent to that unlawful search, <u>see, e.g.</u>, <u>United States v. Whitehorn</u>, 813 F.2d 646, 648-50 (4th Cir. 1987); or took steps to obtain a warrant prior to the unlawful search, <u>see e.g. United States v. Ford</u>, 22 F.3d

15

374, 377-79 (1st Cir. 1994); United States v. Lamas, 930 F.2d 1099, 1103 (5th Cir. 1991).

But when evidence could not have been discovered without a subsequent search, and no exception to the warrant requirement applies, and no warrant has been obtained, and nothing demonstrates that the police would have obtained a warrant absent the illegal search, the inevitable discovery doctrine has no place. In those circumstances absolutely nothing suggests, let alone proves by a preponderance of the evidence, that the illegally obtained evidence inevitably would have been discovered. The inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents no evidence that the police would have obtained a warrant. Any other rule would emasculate the Fourth Amendment.

For example, in United States v. Mejia, 69 F.3d 309, 319 (9th Cir. 1995), the government argued that even if the court found that the defendant had not consented to a search of his home, the police inevitably would have discovered counterfeit currency found there because other evidence obtained "gave them probable cause to search . . . [and thus] a warrant would have issued if the detectives had sought one." The court held the inevitable discovery doctrine could not apply in these circumstances. "We reject the contention that [the inevitable discovery] doctrine applies where the police had probable cause to conduct a search but simply failed to obtain a warrant. . . . If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be any reason for officers to seek a warrant." Id. at 320.

Similarly, in United States v. Johnson, 22 F.3d 674 (6th Cir. 1994), the Sixth Circuit concluded that, although the police had probable cause to obtain a search warrant for the defendant's apartment (based on the statement of a girl just freed from the apartment), the inevitable discovery exception did not justify their warrantless search (erroneously based on asserted exigency of the circumstances). The court reasoned that "to hold that simply because the police could have obtained a warrant[ ] it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause." Id. at 683. See also

16

United States v. Brown, 64 F.3d 1083, 1085 (7th Cir. 1995) (dicta) ("what makes a discovery `inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search"); United States v. Cabassa, 62 F.3d 470, 472-74 (2d Cir. 1995) (reversing denial of suppression motion because inevitable discovery doctrine did not apply when at the time of the unlawful search the process of obtaining a warrant had just begun, a warrant was never obtained, and probable cause showing was not overwhelming); United States v. Cherry, 759 F.2d 1196, 1206 (5th Cir. 1985) (reversing denial of motion to suppress because inevitable discovery doctrine did not apply where agents "could have obtained a warrant but made no effort to do so"); 5 Wayne R. Lafave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4, at 244 (3d ed. 1996) (care should be taken when applying the inevitable discovery doctrine to be certain that the warrant requirement is not bypassed); 1 John Wesley Hall, Jr., Search and Seizure § 7:16, at 376-77 (2d ed. 1991) ("The inevitable discovery doctrine will not justify a search . . . simply because the police could have gotten a search warrant.").

D.

In this case, the government does not contend that further investigation would have uncovered the cocaine without the need for a search. The government does not contend that an exception to the warrant requirement permitted a warrantless search. Indeed, the government does not even contend that it had probable cause at the time the illegal search of the duffel bag occurred and simply failed to use that probable cause to obtain a warrant. Rather, it offers an even more attenuated argument. The government claims that at the time of the unlawful search it had the means -- by taking routine steps (i.e., obtaining the services of the drug dog) -- to establish probable cause for a search warrant. As outlined above, however, the testimony and factual findings made by the district court conclusively undercut the claim that such steps were "routine" for these officers.

Moreover, even assuming that the evidence established probable cause, with or without the drug dog alert, nothing indicates that the officers ever contemplated obtaining a search warrant. In fact, both Detective Tackett and Agent Wilcox conceded that the task force's

17

normal routine involved opening and searching unclaimed bags without obtaining a warrant. Thus, not only does the government's case lack concrete evidence that the officers would have obtained a warrant, the testimony of record affirmatively supports the conclusion that they would <u>not</u> have done so. To permit the presence of evidence establishing probable cause to whitewash the unlawful search would eviscerate the warrant requirement. As Judge Posner has noted, "a warrant is a condition precedent to a lawful search or seizure, other than in exceptional circumstances of which superfluity is not one." <u>United States v. Cardona-Rivera</u>, 904 F.2d 1149, 1155 (7th Cir. 1990).

IV.

For the foregoing reasons, the district court erred in denying Allen's motion to suppress. Because the improperly seized evidence, as in <u>Thomas</u>, 955 F.2d at 211, "comprised most of the government's case," we must overturn Allen's conviction. The case is remanded for further proceedings consistent with this opinion.

<u>REVERSED AND REMANDED</u>