**UNITED STATES of America, Plaintiff,**

**v.**

**Joseph NIEVES and Zeeboat Cofie, Defendants.**

**Crim. No. AMD 97–0398.**

United States District Court,
D. Maryland.

Oct. 7, 1998.

---

Lynne A. Battaglia, United States Attorney, Tarra DeSields, Assistant United States Attorney, Baltimore, MD, for plaintiff.

William B. Purpura, Baltimore, MD, for Joseph Nieves.

Harold I. Glaser, Baltimore, MD, for Zeeboat Cofie.

### MEMORANDUM

DAVIS, District Judge.

The two-count indictment in this case charges defendants Nieves and Cofie with conspiracy to distribute and possess with intent to distribute heroin, in violation of 18 U.S.C. § 846, and possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). Each defendant has moved to suppress physical evidence, including, *inter alia,* 90 grams of heroin, cutting agents and packaging material and an electronic scale seized from their motel room. The court held an evidentiary hearing at which the government presented the testimony of Baltimore City Police Detective John Jackson and federal Drug Enforcement Administration Agents Robert Hladun and Jeffrey Tiburzi (together "agents"). On the basis of the findings of fact and conclusions of law set forth herein, the court grants by separate order the motions of the defendants to suppress evidence.

### I. Findings of Fact

In the fall of 1997, members of a joint task force of the Baltimore City Police Department and the Drug Enforcement Administration were conducting an investigation of drug trafficking activities which were sometimes centered at a gas station located at Franklin Street and Lauretta Avenue in West Baltimore. Detective Jackson and Agent Hladun were members of the task force. Their investigation had disclosed that drug dealers from New York often rendezvoused with Baltimore drug traffickers at or near the gas station and that an open air pay telephone erected at the rear of the gas station was used frequently to make arrangements for drug transactions.

On October 17, 1997, between 3:00 and 4:00 p.m., Jackson and Hladun, each in plainclothes, were in an unmarked vehicle traveling westbound on Franklin Street in front of the gas station when they observed a black Jeep-type vehicle ("the Jeep") lawfully parked on Lauretta Avenue near the pay telephone, at the rear of the gas station. Their interest was aroused, as they suspected that the vehicle might be implicated in their on-going investigation. They circled the block, approached the Jeep from the rear and drove past it, and in doing so they could observe that the Jeep had New York license tags, although they could not make out the actual tag number. They also observed that there were two occupants seated in the

Jeep—defendant Nieves in the driver's seat and defendant Cofie in the front passenger seat. Cofie was speaking on a cellular phone. On the basis of the rather fleeting observations thus made, neither the Jeep nor its occupants were known to the agents. Specifically, apart from the fact that the Jeep had New York tags and was parked near the gas station pay phone, the agents had no basis upon which to connect the Jeep or its occupants—the defendants—to their on-going investigation or to any drug activity at all. Nevertheless, the agents decided to conduct surveillance of the Jeep and the defendants, its occupants.

Thus, Jackson and Hladun circled the block a second time and brought their vehicle to rest at the curb perhaps two hundred feet behind the Jeep. A large truck was parked between the government vehicle and the Jeep, providing a measure of relative seclusion for the agents as they took up their surveillance of the Jeep. After several minutes a Chevrolet bearing South Carolina license tags pulled up to the pay telephone. A male driver and a female passenger were in that vehicle. The driver got out and walked over to the defendants' Jeep and apparently had a conversation with one or both defendants lasting approximately five minutes. This activity was out of view of the agents. The driver returned to the Chevrolet parked near the pay phone and departed the area. At about the same time, Nieves quickly pulled away from the curb on Lauretta Avenue and darted quickly into traffic on Franklin Street, heading westbound in the general direction of the Baltimore City/Baltimore County line.

In the meantime, Jackson had assumed that the driver of the Chevrolet had actually entered the Jeep occupied by the defendants and that a drug transaction had occurred. He broadcast over police radio a request for assistance from any nearby marked police unit "in reference to [three] gentlemen in a black [P]athfinder ... in reference to ... [a controlled dangerous substance] violation." *See* Gov't Exh. 3A at [unnumbered pp.] 1–2. According to Jackson, his purpose in calling for a marked unit was "to have [the defendants] identified," Trans. at 30, "in reference

to an ongoing investigation." *Id.* at 60. Indeed, the following exchange occurred during Jackson's testimony:

THE COURT: Officer Jackson, is it your testimony that law enforcement officers are legally authorized to stop a vehicle for the purpose of identifying the person operating that vehicle?

THE WITNESS: In reference to?

THE COURT: In reference to anything. Is that your training and experience?

THE WITNESS: That is correct.

*Id.* at 61. Thus, Officer Jackson does not believe that reasonable suspicion or probable cause is ever necessary to authorize the detention of a motor vehicle operator for the purpose of *identifying* such a person. *But see Delaware v. Prouse,* 440 U.S. 648, 662, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

In any event, before the marked Baltimore City police unit requested by Jackson arrived, as set forth above, the Jeep pulled off. Jackson and Hladun gave chase, at times falling approximately three blocks behind the Jeep, but also at times approaching to within fifty feet of the Jeep. The government presented no evidence that the defendants knew or even suspected that they were being followed or had attracted the attention of law enforcement officers. Jackson requested that the Baltimore City police helicopter unit ("Foxtrot") provide aerial surveillance until the marked motor units previously requested could overtake, stop and detain the defendants' Jeep.

Jackson testified at the suppression hearing that Nieves, as the operator of the Jeep, committed several traffic infractions—including driving without a seat belt and failure to signal—as the Jeep pulled away from its parked position on Lauretta Avenue and proceeded in a westerly direction on Franklin Street/Edmondson Avenue for approximately a dozen blocks before it was ultimately stopped by marked police cruisers.

The court wholly disbelieves this testimony. Neither Jackson nor Hladun was in a position to determine whether the defendants had their seat belts engaged. Moreover, the tinted glass installed on the Jeep would have made such an observation largely impossible

even if the agents had been in a position from which such an observation could have been made. Furthermore, Jackson's vague testimony that Nieves was "switching lanes and driving aggressively," *see* Aff. in Supp. Fed.Comp. at 3, and "erratically . . . [in the way] that drug traffickers frequently drive . . . to elude law enforcement and detect surveillance," *see* Gov't Exh. 7 at 3, is at once conclusory, profoundly self-serving and not worthy of belief. It is abundantly clear from the evidence that Jackson and Hladun simply decided to have a marked police vehicle stop the Jeep at the earliest opportunity; they attempted to arrange an encounter before the Jeep pulled out of Lauretta Avenue, but the unit did not arrive in time, apparently because of a "shift change" in the police department. As Hladun testified, they had merely "an instinct that this was part of [their] New York investigation," Trans. at 96, and they were willing to take preemptive action to obtain "intelligence" or the cooperation of a coconspirator. *Id.* at 141–42.

In due course, with the assistance of "Foxtrot," uniformed police stopped the Jeep. Jackson and Hladun immediately took charge of the scene. Because the helicopter pilot had reported by radio that, when the police car's emergency lights activated attendant to the stop of the Jeep, Cofie's "hands [were] moving rapidly," the officers drew their weapons and ordered the defendants to the ground immediately. Shortly after each defendant had produced an altered driver's license, they consented to a search of the vehicle. The agents found a total of $24,695 in cash and a half-smoked marijuana cigarette in the vehicle. A drug detection canine was brought to the scene; the dog alerted to the cash but not to the marijuana cigarette. In any event, the defendants (who had offered conflicting explanations of their possession of the Jeep) were placed under arrest, apparently for possession of both altered identification documents and the marijuana cigarette. As Hladun testified:

> I am saying that at that time, there was a lot of strange things with those licenses. It just did not look like it was legal. Those documents did not look legal to me. I have worked a lot of West African cases. These gentlemen did not look like they

were born in New York or in the Virgin Islands. They had—it just did not appear right.

*Id.* at 125.

As Jackson transported the defendants to be processed at the DEA office in downtown Baltimore after they were arrested, he noticed, while driving eastbound in front of the gas station at which the episode had begun, that the Chevrolet had returned to the gas station. When Jackson confronted the driver of the Chevrolet (who had met with Cofie and Nieves earlier), the driver told Jackson that he had met Cofie and Nieves (whose names he insisted he did not know) "in reference to doing business," but he would not elaborate. The driver did explain, however, that he was back at the gas station because he had arranged (at the meeting observed by Hladun and Jackson) to meet Nieves and Cofie there in "45 minutes."

The defendants were searched at the DEA office and Nieves had on his person a motel key. When the agents questioned him about the key, Nieves falsely asserted that he had failed to turn in the key when, two weeks earlier, he had stayed at the Howard Johnson motel on Route 40 in Baltimore County. That motel is located just a few minutes from the gas station. The defendants had been driving in the direction of the motel when they were detained after they left the gas station.

The agents gave the key to DEA Special Agent Jeffrey Tiburzi to pursue the lead it provided. Tiburzi traveled to the Howard Johnson and learned from the front desk clerk that the key was not a Howard Johnson key. The clerk suggested that the key might be a Days Inn key. The agents traveled a short distance to a nearby Days Inn. The clerk there advised that it was not a key from his motel, but he suggested that the agents might check at a second Days Inn just a few miles away. As Tiburzi testified, the agents then struck pay dirt:

> Q What happened when you arrived there?
>
> A Myself and Special Agent Holiman went inside to the lobby area and went to the desk. We presented the key, and the

desk clerk said: That's one of our keys. Special Agent Holiman said—well, first, we identified ourselves as being with the Drug Enforcement Agency. Then he said: We just arrested two Nigerians, and we think they may be staying at this hotel. To that, the desk clerk said: Zeeboat? That obviously was one of the people that were in question. We were like: Yeah, that's one of guys we are looking for. She said: Yes, he is staying here. At that point, she told us what room it was, Room 307. She then printed out a check-in sheet with his name on it and the room number.

Trans. at 160–61. This occurred at approximately 7:00 p.m., three hours or so after the defendants had been detained. The clerk told the agents that she remembered Cofie and Nieves because when they checked in, they had erroneously been assigned a room with a single bed. They had been reassigned to room 307, which contained two beds. The defendants had not checked out of the motel. The clerk never indicated, and the agents never obtained information from any source to suggest in any way that persons other than the two defendants in this case had access to or were associated with room 307.

Room 307 is a ground level unit opening onto an outside walkway. The agents observed that the light was on in the room and that the curtains covering the large picture window were slightly parted. The agents inferred from these two facts that "there was a good possibility that there was somebody . . . in [the] room." *Id.* at 170. The court finds that this inference was, to be charitable, fanciful and that this testimony reflects that a pretext for a warrantless entry into the room very likely has concocted. After discussing the circumstances with Holiman and reflecting on what the agents knew about the earlier events, Tiburzi felt certain that drugs were in the room. *Id.* at 163. To be sure, Tiburzi was confused or uninformed about some of the facts surrounding the earlier events. *See id.* at 165–68 (Tiburzi testified that he thought, incorrectly, that the driver of the Chevrolet had remained at the gas station after the defendants had departed, although he later modified that testimony to suggest that he had no knowledge whatsoever in these regards at the time he actually entered room 307 on the evening of October 17, 1997.).

In any event, when asked at the suppression hearing why the agents did not immediately seek a search warrant, Tiburzi essentially ignored the question. He responded: "We decided to knock and announce our presence as police, to try to gain entry that way." *Id.* at 170. This non-response to the prosecutor's simple question on direct examination bespeaks a palpable lack of candor and constitutes substantial evidence that the present justifications offered for the search which followed, as described below, are *post hoc* rationalizations intended to avoid application of the exclusionary rule and salvage this case involving serious charges and significant drug quantities.

There was no one in the room and thus, no one responded to Tiburzi's knocks on the door. Tiburzi and the agents accompanying him promptly entered room 307 using the key obtained from Nieves. In what can fairly be described as a miscellany of seemingly desperate justifications, approaching incoherence, Tiburzi sought to justify this warrantless entry, relying on exigent circumstances and the alleged need for a "protective sweep," as follows:

After we did that, after knocking and announcing and not getting a response, then we knew we had to go in and secure the room. If there had been anybody in the room, at that point, if you knock and announce and you don't get a response and you walk away, if there is any narcotics or drugs in that room, then the likelihood of them being destroyed is highly probable.

Also, if there is someone else in that room, if you announce your presence and then walk away and try to obtain a warrant at that point without securing the premises, there is the possibility that that person could be armed. Drug dealers are frequently armed. So, you would be putting yourself in jeopardy by doing that.

Also, at that point, by the time we reached the hotel, there was a significant time lapse from that point to the point that the two individuals were pulled over.

If there was a third individual involved, the third individual is going to start to get—his anxiety level is going to go up because he is going to wonder: Why aren't these people back yet? It's been a long time. I know when they left, and I know what they were supposed to do, so why aren't they back?

At that point, that person could even be making plans to destroy drugs or to destroy evidence or to move it or to be prepared to destroy it or to get rid of it.

*Id.* at 170–71. After the warrantless entry, the agents quickly confirmed that there was no one in the room. Agent Holiman noticed that a white plastic bag containing, *inter alia,* a smaller, opaque brown paper bag, was stuffed in the space between the dresser and the wall. Agent Tiburzi identified a photograph of the bags. It is impossible to determine the contents of either bag from their condition and placement as they were stuffed between the dresser and the wall at the time of the warrantless entry by the agents. Agent Holiman manipulated the bags with his fingers, *id.* at 195, in order to peer into the bags and was able to determine the presence of "a cake of mannite [cutting agent] and a sifter … and a brown powdery substance," i.e., heroin. *Id.* at 173.

The agents at the motel thereupon called the DEA office and received instructions from Hladun and Jackson to withdraw from the room. Subsequently, Jackson obtained a search and seizure warrant from a state court judge and a second entry into room 307 was effected on the authority of that warrant. The evidence which is the subject of the pending motions was seized.

## II. Conclusions of Law

■ (1) Detective Jackson and Agent Hladun lacked a reasonable articulable suspicion (and they certainly lacked probable cause) to stop the defendants at the time the defendants' vehicle was pulled over and detained on Edmondson Avenue; their suspicions of illegality never rose above the level of a hunch. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ (2) The detention of the defendants was unreasonable at its inception. *United States v. Sprinkle,* 106 F.3d 613, 618 (4th Cir.1997).

■ (3) The seizure of the key to room 307 from defendant Nieves and its use to make entry into room 307 were tainted by the antecedent unreasonable seizure of the person of Nieves. *Wong Sun v. United States,* 371 U.S. 471, 486–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ (4) Both defendants had a reasonable expectation of privacy at all times in room 307 and its contents. *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

■ (5) Agent Tiburzi acted unreasonably in effecting a warrantless entry into room 307 because: (a) the facts known to him and all the agents (including Jackson and Hladun) at the time of the warrantless entry excluded any *reasonable* probability that the room was occupied by a coconspirator; and, even if this is not so, (b) any exigency which might (but did not) justify a warrantless entry was purposefully created by the agents themselves; and, in any event (c) Agent Tiburzi had already determined to enter the room before his arrival at the motel, and he was not motivated to effect the warrantless entry by any exigency to protect law enforcement officers or others or to preserve evidence. *United States v. Lalor,* 996 F.2d 1578, 1584 (4th Cir.), *cert. denied,* 510 U.S. 983, 114 S.Ct. 485, 126 L.Ed.2d 436 (1993).

■ (6) The seizure and search of room 307 exceeded the scope of a lawful protective sweep when Agent Holiman used his fingers to manipulate the bags hidden between the dresser and wall in order to determine whether contraband was contained in the bags. *Maryland v. Buie,* 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *United States v. Campbell,* 945 F.2d 713, 715 (4th Cir.1991).

■ (7) No exception to the exclusionary rule applies to foreclose its application to the facts of this case because: (a) the subsequently-obtained warrant is not an "independent source" for the seizure of evidence in that that warrant was only sought and ob-

tained as a means of sanitizing the evidence which had already been searched for and seized by Agent Tiburzi and the agents working with him; (b) the warrant would not have been sought and obtained if the search by Agent Tiburzi had yielded no contraband in room 307; and (c) for like reasons, the government failed to establish by a preponderance of the evidence that the discovery of the drugs was "inevitable." *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *Segura v. United States,* 468 U.S. 796, 805, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Nix v. Williams,* 467 U.S. 431, 440–48 & n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *United States v. Allen,* 159 F.3d 832, 1998 WL 665413 (4th Cir.1998).

(8) The failure of the government agents to obtain a warrant before entering room 307 was unreasonable and violated the Fourth Amendment. *United States v. Collazo,* 732 F.2d 1200, 1204 (4th Cir.), *cert. denied,* 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1984).

(9) The failure of the government agents to obtain a warrant before searching the bags found in the room was unreasonable and violated the Fourth Amendment. *Arizona v. Hicks,* 480 U.S. 321, 324, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

(10) The evidence obtained as a result of the traffic stop of the Jeep, as well as the evidence seized from room 307, was obtained by methods and means which violated the defendants' constitutional right under the Fourth Amendment to be free from unreasonable searches and seizures and its use by the government in its case-in-chief is therefore prohibited by the exclusionary rule. *Weeks v. United States,* 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

### III.  Conclusion

For the reasons stated, I shall grant defendants' motions to suppress evidence.