**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-5012

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

OMAR ARELLANO,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (1:09-cr-00241-LMB-1)

Argued: December 10, 2010          Decided: February 8, 2011

Before MOTZ, GREGORY, and WYNN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Geremy C. Kamens, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Jason Hudson Poole, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Caroline S. Platt, Research and Writing Attorney, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Neil H. MacBride, United States Attorney, Lore A. Unt, Special Assistant United States Attorney, Robert E. Friedman, Special Assistant United States Attorney, Gene Rossi, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A jury convicted Omar Arellano of possession and use of a fraudulent resident alien card and possession of a stolen or unauthorized social security card. The district court sentenced him to twelve months imprisonment. Arellano appeals, challenging three pretrial rulings of the district court. We affirm.

## I.

First, Arellano maintains that the district court erred in denying his motion to suppress evidence the police found when searching his car.

## A.

On April 7, 2009, at approximately 2:50 pm, Deputy Sheriff Steven Shiner stopped a blue Toyota Corolla driven by Arellano because of a broken brake light. When Deputy Shiner, communicating in Spanish, asked Arellano for identification, he provided a Mexican driver's license. The deputy asked Arellano for his home address; Arellano replied that he lived at Kira Court, a local housing complex, but refused to give the exact address or the names of the people with whom he lived. After the officer ran the car's tag number through the system, he discovered that the tags had been issued to a grey Corolla with a different VIN number.

3

The deputy then asked Arellano to step out of the vehicle, and Arellano consented to a search of his person. Deputy Shiner found $480 in U.S. currency, a wallet, about 30 business cards for a Latino photography business, and a cell phone. When the officer asked for the car's registration, Arellano said he did not have it because the vehicle belonged to a friend, but refused to provide the name of that friend. At Deputy Shiner's direction, Arellano sat in the back seat of the police car for five to ten minutes, during which time the deputy determined that his foreign driver's license was invalid. Arellano had still not provided an address which would allow for the officer to release him on a summons, and Deputy Shiner later testified that he decided at that point to take Arellano into custody and tow the vehicle, which was improperly registered and was blocking the egress of a business.

Before the vehicle was towed, the deputy proceeded to search it and found, hidden under the floor mats, coin envelopes containing social security cards, permanent resident cards, an employment authorization card, and a Virginia state identification card, which he suspected was fraudulent. He also found a digital camera in the glove compartment and another in the console between the two front seats. The officer took Arellano into custody, read him a Miranda warning, and advised

4

him that he was under arrest for lacking proper registration and a valid operator's license.

B.

Arellano contends that the officer illegally searched his car and so the district court should have suppressed the fruit of that search. The court denied Arellano's motion to suppress, finding that Deputy Shiner arrested Arellano when he was seated in the back of the police car and so the search accompanied a valid arrest. We need not reach the question of whether Arellano was actually under arrest when the deputy seated him in the police car because the police would, in any event, have soon thereafter arrested Arellano and so inevitably discovered the evidence in Arellano's car.

Under the doctrine of inevitable discovery, "information obtained by unlawful means is nonetheless admissible '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" United States v. Allen, 159 F.3d 832, 838 (4th Cir. 1998) (citing Nix v. Williams, 467 U.S. 431, 444 (1984)). The inevitable discovery doctrine applies only where "routine or factually established investigative steps . . . would inevitably lead to discovery of the evidence;" speculation and conjecture may play no role in the analysis. Allen, 159 F.3d

5

at 841; see also United States v. Thomas, 955 F.2d 207, 209, 210 (4th Cir. 2010).

Here, the deputy, whose credibility was not questioned, testified that Arellano offered only an invalid operator's license and improper vehicle registration. Given these facts and Arellano's refusal to provide a verifiable address to allow for his release on summons, the officer would soon have arrested Arellano, even if he had not done so when he ordered Arellano into the patrol car. Once Arellano was under arrest, impounding the vehicle would have been a matter of course. The Fauquier County Sheriff's Office General Order 5.27 specifically authorizes impoundment under those circumstances. Importantly, the Order also provides that law enforcement officials conduct a standard inventory search at the time of towing. These are precisely the "routine or factually established investigative steps" that Allen contemplates in its discussion of the inevitable discovery doctrine. 159 F.3d at 841. See, e.g., United States v. Lynn, 592 F.3d 572 (4th Cir. 2010) (finding that the inevitable discovery doctrine would provide the basis to arrest the defendant then conduct an inventory search of his vehicle).

Second, Arellano argues that the district court erred in denying his motion to suppress evidence obtained from the search of his cell phone.

At the police station, Deputy Shiner turned on Arellano's cell phone, which, at that point, was powered off. The deputy proceeded to answer and return several calls to Arellano's phone. Speaking in Spanish to Deputy Shiner, the callers inquired about their identification cards and social security numbers. The deputy later took Arellano to the jail for booking.

More than two months later, on June 17, 2009, the Government obtained a search warrant for the cell phone. The Government submitted an affidavit in support of the warrant from a senior special agent with Immigration and Customs Enforcement that included one sentence describing the information Deputy Shiner acquired by turning on and using the cell phone. A magistrate judge granted a search warrant for the contents of the cell phone. During the execution of the warrant, law enforcement officials extracted contacts, call logs, and text messages from the phone. Some of the text messages included information matching identification documents from the seized vehicle. One text message contained a birthday greeting sent on Arellano's date of birth.

Arellano moved to suppress the evidence gathered from the cell phone. The district court found that while the deputy's initial seizure of the phone was permissible, turning on and using the phone at the station constituted a warrantless search that exceeded the scope of a search incident to arrest. The court recognized that one sentence in the affidavit relied on evidence flowing from this unlawful act, but found that the sentence did not taint the search warrant because, independent of that sentence, the affidavit stated probable cause for the warrant.

We agree. Our review is deferential in nature; "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238 (1983) (internal quotation omitted). Thus, we simply "determine whether, when [the improper] evidence is excluded from the application for the warrant, probable cause to support the warrant still existed." United States v. Moses, 540 F.3d 263, 271 (4th Cir. 2008) (internal quotation omitted).

The sentence in question states: "Within several hours, the deputy answered several incoming calls to the cellular telephone, including one call from an individual wanting to return his cards, one call from an individual wanting his identification card, and one call from an individual wanting to speak to

8

'Omar.'"  Without that sentence, the affidavit sets forth the basic facts surrounding the stop and search -- namely that Arellano refused to provide his address or offer an explanation of whose vehicle he was operating and that the deputy found in the car 14 suspicious identification documents in other people's names, 30 business cards for a company called "Foto Latino," and two digital cameras, and found in Arellano's pockets the cell phone sought to be searched.  The affidavit also explains that cell phones commonly contain text messages, phone numbers, contacts, personal calendars, dates, and other electronic records that would provide evidence of Arellano's alleged unlawful activity.

Given the presence of business cards related to producing photographs for false identification cards and containing a printed phone number, in close proximity to the cell phone which appeared to be Appellant's, and 14 suspected false identification cards, law enforcement agents reasonably looked to the cell phone for evidence of Arellano's unlawful activity.  See United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988) (noting that "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence.").

III.

Finally, Arellano contends that the district court erred in denying his motion in limine to exclude a witness's identification testimony.

A.

Arellano challenges the in-court identification of Victoriano Ticas, whom Arellano had purportedly approached at a Wal-Mart four to five months before the trial and for whom he agreed to make a false identification card. On the evening of July 22, 2009, law enforcement officials went to Ticas's home and showed him a single photo of Arellano, along with the false identification cards they had found in Arellano's car (including one with a photo of Ticas). When asked if he recognized Arellano's photo, Ticas stated that he did not. Ticas was not wearing his glasses, and the agent conducting the interview suspected that Ticas was under the influence of alcohol. Two days later, the agents returned and showed the same photo to Ticas, who then stated that he recognized Arellano and had seen him on one occasion about five months earlier in a Wal-Mart parking lot.

At the third interview, a few days later, the agents showed Ticas the same photo in a spread of photos that included photos of five other Hispanic males. That meeting was conducted in the back of a government-operated vehicle, with three law enforcement

10

agents present.  At that point, the agents offered Ticas immunity from prosecution for seeking fraudulent documentation and assistance obtaining legal status.  Again, Ticas stated that he recognized Arellano.

On July 30, 2009, Arellano filed a motion in limine to exclude Ticas's identification as unduly suggestive.  The district court ordered that the motion would be addressed in court.  When the Government called Ticas at trial, Arellano did not object.  Ticas first testified that he did not recognize anyone in the courtroom and then, after putting on his glasses, identified Arellano.  After trial, the court denied the motion in limine as moot.

B.

In determining whether identification testimony is admissible, we employ a two-step analysis.  "First, the defendant must establish that the photographic lineup procedure was impermissibly suggestive. . . .  Second, even if the procedure was suggestive, the in-court identification is valid if it was reliable."  United States v. Wilkerson, 84 F.3d 692, 695 (4th Cir. 1996) (internal citations omitted).

Assuming that the identification procedure at issue here was impermissibly suggestive, we cannot hold that its admission constitutes reversible error.  This is so because the second step of the inquiry allows for the admission of identification

11

evidence despite its improper suggestiveness "if the identification was sufficiently reliable to preclude the substantial likelihood of misidentification." United States v. Johnson, 114 F.3d 435 (4th Cir. 1997).

In assessing the reliability of an identification, we consider: "(1) the witness' opportunity to view the perpetrator at the time of the crime; (2) the witness' degree of attention at the time of the offense; (3) the accuracy of the witness' prior description of the perpetrator; (4) the witness' level of certainty when identifying the defendant as the perpetrator at the time of the confrontation; and (5) the length of time between the crime and the confrontation. . . . These factors are weighed against the 'corrupting effect of the suggestive identification itself.'" Wilkerson, 84 F.3d at 695 (internal citations omitted).

Here, the first two factors counsel strongly in favor of the reliability of the identification. Ticas had approximately three minutes to view Arellano. Moreover, the meeting took place face-to-face, one-on-one, and in the daytime. Compare United States v. Saunders, 501 F.3d 384, 392 (4th Cir. 2007) (the facts that the witness had a "clear view of the side of [defendant's] face" and made eye contact for "about three to four seconds, maybe a little longer" weighed in favor of the reliability of the identification) and Wilkerson, 84 F.3d at 695 (in-court

12

identification would be reliable because witnesses saw defendant's face "in broad daylight while their full attention was focused on him"). With respect to the degree of attention at the time of the encounter, Ticas met directly with Arellano, spoke with him, exchanged phone numbers with him, and had his photo taken by him. By contrast, "[i]n-court identifications have also been upheld even when a witness had only a brief but 'real good look' at his assailant in the headlights of a passing car." United States v. Burgos, 55 F.3d 933, 942 (4th Cir. 1995), citing Neil v. Biggers, 409 U.S. 188, 197 (1972).

Given that the record contains no evidence that law enforcement agents asked Ticas to describe Arellano prior to showing him the photo, the third factor plays no role here. The fourth factor (the witness' level of certainty), like the first two, weighs in favor of reliability. Although Ticas failed to identify Arellano when he first saw the photo, he reasonably attributed that failure to the fact that it was nighttime and he was not wearing his glasses at the time. Furthermore, Ticas successfully identified the camera that Arellano used to take his picture, and he stated in court that he was "sure" Arellano was the person at Wal-Mart who took his photo and agreed to make the false documents.

Only the fifth factor weighs against the reliability of Ticas's identification. The Government concedes that the fact

13

that "four or five months" passed between Ticas's initial meeting with Arellano and his in-court identification "arguably favors the identification being unreliable." Appellee's Br. at 57. The Supreme Court, however, has found that a time delay of seven months between an encounter and an in-court identification did not undermine the reliability of the identification. Neil, 409 U.S. at 201.

Ultimately, this case falls squarely in line with the great majority of identification cases in which courts find circumstances determined to be suggestive nonetheless "sufficiently reliable to preclude the substantial likelihood of misidentification" under the second prong of the test. See Johnson, 114 F.3d at 442 (citing United States v. Washington, 12 F.3d 1128 (D.C. Cir. 1994); United States v. Sanchez, 988 F.2d 1384 (5th Cir. 1993); Ruff v. Wyrick, 709 F.2d 1219 (8th Cir. 1983)).

IV.

For all of these reasons, the judgment of the district court is

AFFIRMED.

14